United States Court of Appeals
Fifth Circuit

**F I L E D**

**January 22, 2007**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

)))))))))))))))))))))))))))

No. 04-51183

)))))))))))))))))))))))))))

UNITED STATES OF AMERICA

Plaintiff-Appellee,

v.

MICHAEL CURTIS LEWIS, also known as Bones; CHARLES SAMSON, also
known as Killer; MALACHI DAVID WREN; VICTOR WESLEY TUCKER, also
known as Pokey; DONNIE THOMPSON; MICHAEL NORRIS MARTIN, also
known as Mikey; BUDDY FORD; LEONARD DUANE GRIFFITH, also known as
Radar; JERRY WAYNE BEASON; SHANE SAMSON, also known as Buffy

Defendants-Appellants

---

Appeals from the United States District Court
for the Western District of Texas

---

Before JONES, Chief Judge, and REAVLEY and PRADO, Circuit Judges.

PRADO, Circuit Judge:

Following a three-week trial, a jury convicted Donnie
Thompson ("Thompson"), Michael Norris Martin ("Martin"), Buddy
Ford ("Ford"), Leonard Duane Griffith ("Griffith"), Jerry Wayne
Beason ("Beason"), and Shane Samson of conspiracy to manufacture
and distribute over fifty grams of methamphetamine or 500 grams
of a substance or mixture containing methamphetamine, in
violation of 21 U.S.C. § 846. The same jury convicted Michael

1

Curtis Lewis ("Lewis"), Charles Samson, Malachi David Wren ("Wren"), and Victor Wesley Tucker ("Tucker") of that offense and of a continuing criminal enterprise involving more than 15,000 grams of methamphetamine, in violation of 21 U.S.C. § 848. Now these defendants appeal, raising various objections to their convictions and sentences.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On March 17, 2004, the grand jury sitting in the Midland-Odessa Division of the Western District of Texas returned an indictment against twenty-eight individuals for methamphetamine-related offenses. Eighteen of these individuals pleaded guilty. The ten defendants named above pleaded not guilty, and the case proceeded to trial. Jury selection was held on June 28, 2004, and the trial took place from June 28 to July 19, 2004.

At trial, the government attempted to prove a large methamphetamine conspiracy centered on the Aryan Circle gang. The Aryan Circle is a prison-based organization with a white-supremacist ideology. Its members are, in theory, ranked according to a militaristic hierarchy; membership may be maintained inside and outside prison, though rank does not necessarily carry over from one realm into the other. Most, though not all of the defendants were members of the Aryan Circle. The government's proof was designed to show that the Aryan Circle, led by Lewis, Charles Samson, Wren, and Tucker,

2

succeeded in dominating the methamphetamine trade in and around Odessa, Texas. Law enforcement officers and the cooperating witnesses testified to the methamphetamine-related activities of the Aryan Circle members and their associates, including the gathering by legal and illegal means of methamphetamine "precursors," such as cold medicines, batteries, and anhydrous ammonia; the manufacture, or "cooking," of methamphetamine; and the sale and use of methamphetamine-containing substances.

The jury found each defendant guilty of the charges against him. The defendants moved unsuccessfully for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Lewis, Charles Samson, Wren, and Tucker were each sentenced to life in prison, the mandatory term under the continuing criminal enterprise conviction; the court ordered no sentence for these defendants' conspiracy convictions because conspiracy is a lesser included offense of continuing criminal enterprise. The district court sentenced Griffith to thirty years in prison, Martin to 210 months in prison, Beason to 130 months in prison (the sentence was subsequently reduced to 120 months), Thompson to 189 months in prison, Ford to 324 months in prison, and Shane Samson to 156 months in prison for their conspiracy convictions.

## II. JURISDICTION

These are direct appeals from a final judgment of the United States District Court, which has jurisdiction over all offenses

3

against the United States. This court has jurisdiction pursuant to 28 U.S.C. § 1291.

### III. DISCUSSION

**A. Continuing Criminal Enterprise**

Lewis, Charles Samson, Wren, and Tucker challenge their convictions for a continuing criminal enterprise involving more than 15,000 grams of a substance containing methamphetamine. To establish a continuing criminal enterprise, the government must prove that (1) the defendant organized, supervised, or managed at least five persons[1] (2) in a continuing series of drug violations (3) from which the defendant received substantial income. See 21 U.S.C. § 848(c); United States v. Bass, 310 F.3d 321, 325-26 (5th Cir. 2002). Section 848 is "designed to apply to leaders of large-scale narcotics operations." Bass, 310 F.3d at 326.

Most significant to these appeals is the first element: that of organizing, supervising, or managing at least five persons in the drug trade. This court has stated that "[t]he terms 'organized,' 'supervised,' and 'managed' are not words of art and should be interpreted according to their every day meanings." United States v. Gonzales, 866 F.2d 781, 784 (5th Cir. 1989). Several other circuits have held that the term "organizer" as

---

[1] The precise wording of the statute is "in concert with five or more other persons with respect to whom [the defendant] occupies a position of organizer, a supervisory position, or any other position of management." 21 U.S.C. § 848(c)(2)(A).

used in § 848 implies a person who exercises some degree of managerial authority, rather than one who merely coordinates various players. See, e.g., United States v. Lindsey, 123 F.3d 978, 986-87 (7th Cir. 1997); United States v. Williams-Davis, 90 F.3d 490, 508-09 (D.C. Cir. 1996); United States v. Witek, 61 F.3d 819, 822-24 (11th Cir. 1995); United States v. Jerome, 942 F.2d 1328, 1331 (9th Cir. 1991). This circuit has not had occasion to decide this precise question. See United States v. Garcia Abrego, 141 F.3d 142, 167 n.11 (5th Cir. 1998) (acknowledging the law in these other circuits but stating that the court need not then decide the question). This court has, however, held that without additional indicia of control, a mere buyer-seller relationship is insufficient to establish liability under § 848. Bass, 310 F.3d at 327. We cited the Eleventh Circuit's explanation that "a contrary interpretation would do violence to the common-sense meaning of the words 'organizer' and 'supervisor' and extend 848's reach beyond the scope Congress intended." Id. at 327-28 (citing Witek, 61 F.3d at 822). We also commented that our holding was consistent with the rule of lenity applied where a criminal statute's terms are ambiguous. Bass, 310 F.3d at 328 n.27. This holding in Bass supports the principle that "organizer" within the meaning of § 848 requires indicia of control or authority.

Lewis, Charles Samson, Wren, and Tucker each argue that the evidence at trial was legally insufficient to prove the elements

of continuing criminal enterprise. This opinion examines in turn the merits of their arguments.

1. <u>Standard of Review</u>

Where, as here, a defendant objected to the sufficiency of the evidence at the trial level, the well-established standard of review is whether a reasonable jury could find that the evidence establishes the guilt of the defendant beyond a reasonable doubt. <u>United States v. Menesses</u>, 962 F.2d 420, 426 (5th Cir. 1992). We view the evidence in the light most favorable to the government and give the government the benefit of all reasonable inferences and credibility choices. <u>United States v. Harvard</u>, 103 F.3d 412, 421 (5th Cir. 1997).

2. <u>Lewis</u>

Lewis contends that the government's proof at trial failed to demonstrate that he had sufficient control over any of the participants on the Odessa drug trade so as to make him a leader, organizer, or manager of a continuing criminal enterprise. We agree that the government's evidence falls short of satisfying the first element of a continuing criminal enterprise: that the defendant organized, supervised, or managed at least five persons in the drug trade. The government appears to have capitalized on the facts that Lewis co-founded the Aryan Circle Odessa Chapter in 1997 and held the exalted title of "District Captain" within that chapter. But these facts do not prove that Lewis was a

leader or organizer of the methamphetamine trade in which many Aryan Circle members were, without question, involved. Lewis was incarcerated throughout the majority of the period covered by the indictment.[2] With a few exceptions, references to Lewis in the trial testimony relate only to his use of methamphetamine, not to a role as an organizer of the methamphetamine trade.

The government points to several pieces of evidence as satisfying the first element of continuing criminal enterprise. First, the government claims that Curtis Perkins ("Perkins") testified at trial that Lewis recruited him to participate in the methamphetamine trade in Odessa. The claim that Lewis "recruited" Perkins to join the methamphetamine trade stems from a single conversation that Lewis had with Perkins while both were in prison and Perkins was preparing to leave. Lewis allegedly told Perkins that Perkins could get involved with the methamphetamine trade in Odessa, where the Aryan Circle had the trade "pretty well locked up," and that Perkins could parole to Lewis's ex-wife's home. This testimony does not establish that Lewis supervised, managed or otherwise exerted control over Perkins, merely that he gave him information and advice.

The government also points to Perkins' testimony that Lewis later told him that Lewis had partnered with Tucker and that they

---

[2] Specifically, he was incarcerated from April 2000 to April 2001, July 2001 to June 2003, September 2003 to November 2003, and February 2004 to the time of trial.

were producing and selling ten ounces of methamphetamine per week. Perkins did not say that he had observed Lewis working with Tucker, and Perkins' testimony was not corroborated. Jeff Jordan ("Jordan") testified that Lewis said that Tucker was cooking methamphetamine every week and giving Lewis some for free, but this does not suggest a business relationship between the two Moreover, Perkins' statement does not indicate that Lewis was managing Tucker, or anyone else Tucker was working with.

Johnny Hines, Jr. ("Hines, Jr."), testified that he was present at a meeting where Lewis advised members to slow down their methamphetamine selling because it was generating too much "heat" from law enforcement. He also testified that Lewis advised people to stop dealing with Charles Samson if he continued to "burn them" for methamphetamine or money. This testimony similarly does not establish that Lewis had control or authority over those people, especially given that Lewis's advice was thoroughly disregarded.[3]

Finally, the government points to testimony that Lewis told two persons that there would be retaliation against anyone who took the stand to testify in this case. Lewis's alleged threats that harm would come to Aryan Circle members who testified

---

[3] While the government need not prove that a defendant had absolute control over the persons he is alleged to have organized, supervised or managed, *some* evidence that when the defendant gave instructions, they were on *some* occasions obeyed is necessary to demonstrate indicia of control.

against other Aryan Circle members do not establish his involvement in the methamphetamine trade, nor that he supervised, managed or organized anyone in that trade.

This weak evidence of managerial control over individuals in the methamphetamine trade may be contrasted with numerous witness statements that Lewis was merely a methamphetamine user. In sum, the evidence presented by the government was not nearly strong enough to dispel in the mind of a reasonable jury a reasonable doubt that Lewis organized, supervised, or managed at least five persons in the methamphetamine trade.

### 3. Charles Samson

Charles Samson argues that evidence at trial was legally insufficient to prove that he was a leader, organizer, or manager of a continuing criminal enterprise, or that he received substantial income or resources from drug activities.

Evidence of leadership is strongest against Charles Samson. Hines, Jr., testified with regard to Charles Samson's role in methamphetamine production and distribution that he was "was one the key figures in it. He was the figure, really." Hines, Jr., testified that Charles Samson "told us where to produce it, how to produce it, you know, helped us produce it, helped us sell it." Hines, Jr., testified that he, Buddy Ford, and other cooks were making methamphetamine for Charles Samson, and that Shane Samson was getting pills for Charles Samson every day. Hines,

9

Jr., named five other people as supplying pills and anhydrous ammonia for Charles Samson.

Jordan testified that "if we was told to do something, we had to do it because [Charles Samson] was our district captain. If he told us to cook and we didn't cook, we'd get disciplined for it." Persons who were told to cook by Charles Samson were said by Jordan to include Chris Barrandey ("Barrandey"), Hines, Jr., and Timothy Bishop. Jordan testified that Samson would get a quarter or a half share from most of the cooks that took place, including cooks by Hines, Jr., Barrandey, and Wren. Jordan testified that Samson and Johnny Hines, Sr., beat up Perkins because Perkins refused to cook for Samson.

Tony Wilkins ("Wilkins") testified that if you cooked methamphetamine in West Odessa, "Charlie Samson was going to get his part" of the cook and further stated "he'd have people bring me out there to his house to get his part, what he felt he was owed." Wilkins testified that he cooked numerous times at Charles Samson's house and that he attended meetings at Charles Samson's house where participants in the methamphetamine business discussed obtaining supplies. He stated that Charles Samson was "the boss or the leader" at those meetings.

There is more testimony regarding Charles Samson, but the preceding excerpts suffice to establish that a reasonable jury could conclude beyond a reasonable doubt that Charles Samson

10

organized, supervised, or managed at least five people in the drug trade.

Samson objects that there is not sufficient evidence to prove that he received substantial income or resources from the drug trade. Section 848 does not specify what level of income or resources qualifies as "substantial income or resources." As Samson points out, in many cases where a continuing criminal enterprise conviction was upheld, there was far more evidence of wealth than exists in this case. See, e.g., United States v. Wilson, 116 F.3d 1066, 1088 (5th Cir. 1997)(vacated in part on other grounds by United States v. Brown, 161 F.3d 256 (5th Cir. 1998)) (defendant owned eleven cars); United States v. Chagra, 669 F.2d 241, 257 (5th Cir. 1982)(overruled on other grounds by Garrett v. United States, 471 U.S. 773 (1985))(appellant had "lavish personal expenditures"). Here, the government did not present evidence regarding cars, real estate, bank accounts, or other items of value owned by Charles Samson. Yet this court has also held that "[t]he requirement that a defendant obtain substantial income from drug trafficking is satisfied by showing that many thousands of dollars changed hands, and that some was received by the defendant." United States v. Gonzales, 866 F.2d 781, 784 (5th Cir. 1989). The evidence presented at trial leaves no doubt that thousands of dollars of methamphetamine was produced, and by taking a portion of most cooks, Charles Samson

11

obtained a substantial share. The Second Circuit has stated that the substantial income requirement is met where the defendant had no legitimate income and was able to purchase drugs and finance his living expenses. United States v. Joyner, 201 F.3d 61, 72 (2d Cir. 2000). The record indicates that Charles Samson had no legitimate source of income during the period covered by the indictment, yet paid his living expenses and obtained a steady supply of methamphetamine. A reasonable jury could have concluded beyond a reasonable doubt that Charles Samson obtained substantial income or resources from his drug violations.

### 4. Wren

Wren argues that the government failed to prove beyond a reasonable doubt each element of a continuing criminal enterprise. We hold that the evidence of Wren's organizing, supervising, or managing five or more persons in the drug trade was insufficient to support his conviction for continuing criminal enterprise.

Evidence regarding Wren's official status within the Aryan Circle varied. Wren claims that he never became a "member" of the Aryan Circle; as he never completed his nine-month probationary period, during which he was a "recruit" or "prospect." Others testified that Wren achieved the rank of "sergeant at arms;" others that this was only his "prison rank." But Wren's official rank in the Aryan Circle is of secondary importance. The

12

government points to Wren's alleged role in "smashes," or assaults, which the government claims Wren organized to further the methamphetamine conspiracy. Barrandey testified regarding one "smash," stating that after Leo McCarty ("McCarty") sold him bad-smelling anhydrous ammonia on several occasions, Wren suggested that he, Barrandey, and Jordan go beat up McCarty, which they did. This testimony does not indicate that Wren supervised, organized, or managed Barrandey, Jordan, or McCarty. Barrandey's testimony makes clear that Wren was subordinate to him, for he was Wren's "prospector," or sponsor into the Aryan Circle. Hines, Jr., mentions a smash conducted by Wren, but then explains that "it was over a girl, I believe, one of our prospects." Jordan testified that "Chris Barrandey and Malachi Wren told me" to rob Randy Barnes. This could be construed as evidence that Wren was an organizer or supervisor of Jordan, though more likely the person doing the organizing in this instance was Barrandey.

Hines, Jr., offered somewhat confused testimony that Aryan Circle "sergeants at arms" transmitted orders from Charles Samson to certain cooks that they were required to sell their methamphetamine to Aryan Circle members. Hines, Jr., also stated that "Malachi Wren was a sergeant at arms at one time." But this testimony, while it might imply that Wren transmitted orders to certain cooks, does not establish that they followed those orders. Multiple witnesses testified that cooks sold to whoever

13

was willing to buy, inside or outside of the Aryan Circle.

Most significantly, when asked which five persons Wren had organized, managed, or supervised, Hines, Jr., stated "Jeff Jordan, myself, Shane Samson. There was a bro named Redwood. Tony Wilkins was supposed to be AC . . ." and also stated "Susan Creel, Tony Rister." When asked how Wren had organized or managed Jordan, Hines, Jr., stated "[h]e took him to Floydada. They went up there and got anhydrous and did a cook." When asked how Wren organized or managed him, Hines, Jr., stated "[t]here was a few times he would come by my shop and get--get valves or get pieces for his tanks, and he would need to go up there when he would go steal anhydrous." When asked how Wren supervised, organized or managed Shane Samson, Hines, Jr., testified "I've seen Shane Samson giving pills before, and batteries, for a cook." When asked about what Wren did in regard to Redwood, Hines, Jr., stated "I just know he come down here a couple times and picked up methamphetamine. I don't know if he was bringing the pills or if he was really in the picture with [Wren]." When asked how Wren was organizing Wilkins, Hines, Jr., stated "Tony would have--I believe they would get pills, anhydrous. I mean, you know, you just—-one day somebody might have the pills; somebody else might have the anhydrous. You just get together. What one person has, the other one might need." When asked how Wren organized Creel or Rister, Hines, Jr., responded "[h]e would tell them to go get the

pills and then give them a percentage off the cook."

This testimony indicates sporadic cooperation or coordination between Wren and other parties, but not control or authority by Wren over five or more persons. Hines, Jr.'s descriptions of the exchange of supplies between Wren and parties such as Shane Samson and Hines, Jr., evidence only buyer-seller relationships, without the other indicia of control required by Bass. Section 848 is designed to reach the "top brass" in the drug rings, not the lieutenants and foot soldiers. Garrett v. United States, 471 U.S. 773, 781 (1985). In sum, the evidence presented by the prosecution was not strong enough to eliminate a reasonable doubt that Wren organized, supervised, or managed at least five persons in the methamphetamine trade.

5. Tucker

As an initial matter, Tucker argues that the district court erred by denying his motion to suppress evidence that the police obtained from a warrantless search of his hotel room. We review the district court's factual findings for clear error and its Fourth Amendment conclusions de novo. United States v. Gonzalez, 328 F.3d 755, 758 (5th Cir. 2003). The following facts are undisputed. Tucker and two women, Caldwell and Gillian, occupied a hotel room at the Days Inn. While Tucker was absent, police and hotel staff knocked on the door. Caldwell answered the door. When she turned to retrieve her identification, a police officer placed his foot in the door. Caldwell motioned for the officers

15

to come in. After the officers asked if there were drugs present and stated that a drug dog was on its way, Gillian told the officers that there were drugs in a black bag located in the room.

We conclude that Tucker's Fourth Amendment claim is meritless. As the district court stated, the officer's "knock and talk" strategy is a reasonable investigative tool. See United States v. Gould, 364 F.3d 578, 590 (5th Cir. 2004). The officers reasonably interpreted Caldwell's gesture as an invitation to enter the room. See United States v. Cotnam, 88 F.3d 487, 490 (7th Cir. 1996). The officers did not search the room immediately, but only after Gillian's admission that there were drugs in the room created probable cause. See United States v. Jones, 239 F.3d 716, 720 (5th Cir. 2001) (after "knock and talk," plain view of gun justified search under exigent circumstances).

The district court concluded that, after Gillian's admission, the officers' search was justified by exigent circumstances. Because the presence of exigent circumstances is in essence a factual determination, we review only for clear error. United States v. Howard, 106 F.3d 70, 74 (5th Cir. 1997). In this case, the officers could have reasonably believed that the contraband would be removed if they left to obtain a warrant. See United States v. Blount, 123 F.3d 831, 837 (5th Cir. 1997) (stating that factors indicating an exigent circumstance include "the ready destructibility of the contraband and the knowledge

16

that efforts to dispose of narcotics and to escape are characteristic behavior of persons engaged in the narcotics traffic."). The district court did not clearly err in finding that exigent circumstances existed. We uphold the district court's decision to deny Tucker's motion to suppress.

Tucker next argues that the evidence at trial was insufficient to support his conviction for continuing criminal enterprise. Like Lewis, Tucker was in prison for most of the period covered by the indictment. When out of prison, however, he was by all accounts a prolific cook of methamphetamine, the dominant cook within the Aryan Circle group. Lance Morris ("Morris") testified that Tucker had used Morris's house to cook methamphetamine many times and was in general cooking methamphetamine "every day, every other day." Jordan testified that Tucker told him that he was "cooking over, probably, a pound a week."

Tucker argues that the overt acts in which he was named, if they occurred at all, were only "indicative of a conspiracy on that day for the benefit of the participants that day." However, based on evidence of Tucker's very frequent methamphetamine cooks and of the interlocking relationships of participants in the Odessa, Texas drug trade, it was reasonable for the jury to conclude that Tucker's activities formed part of an ongoing conspiracy. Whether a single conspiracy or multiple conspiracies existed is not dispositive, so long as the elements of § 848 are

17

satisfied.

Tucker claims that there is no evidence that he organized, supervised, or managed anyone. The record suggests otherwise. Morris testified that he gathered precursors for Tucker's methamphetamine cooks and received a portion of Tucker's methamphetamine cook in return. Morris also testified that he saw Martin at Tucker's house multiple times, preparing to cook methamphetamine.[4] Jordan testified that persons working with Tucker in the methamphetamine business were Wilkins ("Tony Wilkins and [Tucker] was cooking dope together and selling dope together"), John Self ("John Self, I know, was selling his dope") Cindy Hines, and Tucker's 15-year old nephew "Kid" ("[Kid] told me he was cooking for [Tucker]").

Wilkins testified that the first methamphetamine cook he did when out of prison was for the benefit of Tucker and Charles Samson. He testified that he had wanted to get out of the drug business, but felt compelled to begin cooking again. Subsequently, Wilkins testified, he and Tucker cooked substantial quantities of methamphetamine approximately every other day for a two-to-three month period. Susan Creel ("Creel") testified that

---

[4] The government's brief claims that Morris's testimony established that "other Aryan Circle members who gathered pills and precursors for Appellant Tucker and Wilkins to cook the methamphetamine" were Kevin Renfro, Charles Samson, and Michael Lewis, but Morris's testimony does not in fact contain this information.

18

she regularly bought finished methamphetamine from Tucker and would resell the methamphetamine. Patrick Daniel Catoe ("Catoe") testified that he once observed Tucker trade pills for methamphetamine with a juvenile, Danny Hallbrook.[5]

It is not clear that Tucker's relationship with each of the above-named persons rose beyond the level of buyer-seller. Based on her testimony, it appears that Creel had only a buyer-seller relationship with Tucker--whenever she wished, she traded the cash she had on hand for his methamphetamine, which she resold, retaining the profits herself. But the jury was entitled to infer that in order to keep his large-scale methamphetamine production operation running, Tucker needed to exercise a degree of control or authority over many of the persons supplying him with precursors and selling the finished product. An element of control or authority is especially likely in the case of the two juveniles who were seen trading or cooking with Tucker. Jury members could also have concluded that Tucker was supervising or otherwise exercising control over Morris, Martin, Cindy Hines, and John Self. Finally, the jury could have reasonably concluded, based on Wilkins' testimony, that he was under the authority of Tucker, although other testimony suggested that the two were equal partners. It is not required that the jury agree

_____

[5] The statement in the government's brief that Catoe testified that he himself traded with Tucker is not found in the record.

19

unanimously as to the identities of the five or more people being organized, supervised, or managed. United States v. Short, 181 F.3d 620, 624 (5th Cir. 1999). There is sufficient evidence in the record for the jury to have reasonably concluded beyond a reasonable doubt that Tucker organized, supervised, or managed at least five persons in the methamphetamine trade.

Tucker next argues that he did not receive substantial income or resources from the sale of drugs. As with Charles Samson, Tucker had no legitimate source of income during his period out of prison, yet he managed to pay living expenses and finance his extensive meth-cooking activities. Creel testified that she paid Tucker approximately $150 nearly every day for methamphetamine, and the record indicates that she was only one of numerous sellers who bought their supply from Tucker. The evidence is sufficient for a reasonable jury to have concluded that Tucker obtained substantial income or resources from his drug violations.

Finally, Tucker argues that the evidence is insufficient to support a jury finding that he was responsible for more than 15,000 grams of a substance containing methamphetamine. FBI Agent Espenshade testified that, conservatively estimated, Tucker and Wilkins produced 10,080 grams of a substance containing methamphetamine. The total amount attributed to the Aryan Circle group was over thirty-one kilograms of a substance containing methamphetamine. In accordance with ordinary principles of

20

conspiracy liability, not only methamphetamine produced by Tucker but also methamphetamine produced or sold by his co-conspirators may be attributed to Tucker. Even if the jury could not have concluded beyond a reasonable doubt that the testimony in this case proved a single conspiracy, the jury could have reasonably found that Tucker was linked by his relationships with Wilkins, Martin, and Charles Samson to sufficient quantities of methamphetamine that when these quantities were added to the more than ten kilograms of methamphetamine that Tucker himself produced, the total reached more than fifteen kilograms.

**B. Conspiracy**

Defendants Wren, Thompson, Ford, Shane Samson, Griffith, Beason, and Martin challenge their convictions for conspiracy to distribute more than fifty grams of methamphetamine or 500 grams of a substance containing methamphetamine. To establish a conspiracy under § 846, "the government must prove beyond a reasonable doubt that (1) an agreement existed between the defendant and one or more persons to violate the applicable narcotics laws; (2) each defendant knew of the conspiracy and intended to join it; and (3) the defendant participated voluntarily in the conspiracy." United States v. Infante, 404 F.3d 376, 385 (5th Cir. 2005). "An express agreement is not required; a tacit, mutual agreement with common purpose, design, and understanding will suffice." Id. Further, "[t]he government need not prove an overt act to show participation in a

21

conspiracy." <u>United States v. Turner</u>, 319 F.3d 716, 721 (5th Cir. 2003).

1.  <u>Motions for Severance</u>

Thompson, Ford, Griffith, Beason, and Martin argue that the trial court erred by denying their motions for a severance. We review a grant or denial of severance for abuse of discretion. <u>United States v. Sudeen</u>, 434 F.3d 384, 387 (5th Cir. 2005). A severance is reversible only on a showing of specific compelling prejudice. <u>Id.</u> "There is a preference in the federal system for joint trials of defendants who are indicted together," particularly in conspiracy cases. <u>Zafiro v. United States</u>, 506 U.S. 534, 537 (1993); <u>United States v. Scott</u>, 796 F.2d 1245, 1250 (5th Cir. 1986). "When the risk of prejudice is high, a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." <u>Id.</u>

Historically, this court has been reluctant to vacate a conviction because the district court refused to sever a trial. <u>See</u> <u>United States v. Bieganowski</u>, 313 F.3d 264, 287 (5th Cir. 2002) ("A spillover effect, by itself, is an insufficient predicate for a motion to sever."); <u>United States v. Peterson</u>, 244 F.3d 385, 393 (5th Cir. 2001) (concluding that a limiting instruction cured risk of prejudice of evidence used against a codefendant); <u>United States v. Rocha</u>, 916 F.2d 219, 228-29 (5th

22

Cir. 1990) ("[S]everance is required on the basis of a disparity in the evidence only in the most extreme cases."). The defendant must "isolate events occurring in the course of the trial and then . . . demonstrate that such events caused substantial prejudice." United States v. Booker, 334 F.3d 406, 415 (5th Cir. 2003).

These defendants complain broadly of the volume of evidence, the disparity of evidence between defendants, and a generalized spillover effect. None point to any specific prejudice resulting from their combined trial. The district court did not abuse its discretion in denying their motions for severance.

2.   Material Variance

Defendants Wren, Thompson, Ford, Shane Samson, Griffith, Beason, and Martin each argue that there was a material variance between the indictment and the government's proof at trial that prejudiced them. To prevail on a material variance claim, the defendants "must prove that (1) a variance existed between the indictment and the proof at trial, and (2) the variance affected their substantial rights." United States v. Pena-Rodriguez, 110 F.3d 1120, 1126 (5th Cir. 1997).

These defendants argue that the government did not proffer sufficient evidence to prove that there was a single, overarching methamphetamine conspiracy in the Odessa, Texas region. They point to evidence suggesting that if the Aryan Circle attempted to control the drug trade in this region, these efforts failed

23

because of disorganization, internal rivalries, and the participants' own drug addictions. These defendants argue that to the extent that there was evidence presented at trial supporting a conviction for conspiracy, this evidence could prove only small conspiracies involving one or two other people.

The evidence in this trial is strongly conflicting as to whether there was a single conspiracy or multiple loose-knit, frequently shifting circles. This court has held, however, that "when the indictment alleges the conspiracy count as a single conspiracy, but the government proves multiple conspiracies and a defendant's involvement in at least one of them, then clearly there is no variance affecting that defendant's substantial rights." United States v. Faulkner, 17 F.3d 745, 762 (5th Cir. 1994) (internal quotation marks omitted). This principle is applicable to the case at hand if it was proved that each of the defendants who raise this objection took part in a conspiracy involving more than fifty grams of methamphetamine or 500 grams of a substance containing methamphetamine.

Wren: Multiple witnesses testified to Wren's involvement in methamphetamine cooking. Hines, Jr., testified that Wren had obtained supplies for methamphetamine cooking from him, that Shane Samson gave Wren pills and batteries for a cook, and that Wren had cooked with Jordan. There was testimony that both Creel and Rister had traded pills for finished methamphetamine with Wren. Rister testified that Wren had cooked methamphetamine a few

24

times at Rister's house. Moreover, Barrandey testified that Wren was his "right-hand man," and Barrandey had a significant role in the methamphetamine trade. While not sufficient to demonstrate a leadership role by Wren, this evidence does satisfy the elements of conspiracy. A reasonable jury could have found that Wren was part of a conspiracy to distribute more than fifty grams of a methamphetamine.

Thompson: Thompson argues that "even if [he] was manufacturing methamphetamine, it was not as part of the Aryan Circle conspiracy." Multiple witnesses described Thompson as a methamphetamine cook who traded with members of the Aryan Circle. Hines, Jr., testified that Thompson was a cook who also supplied anhydrous ammonia to other cooks. Hines, Jr., testified that Thompson sold methamphetamine to himself and to Charles Samson. Paul Baumgardner ("Baumgardner") testified that he learned to cook methamphetamine from Thompson and that every day from May to August 2002, he and Thompson would make an ounce of methamphetamine. Brandon Verette testified that Thompson drove him to the store to get pills between ten and twenty times, and that Thompson would get a portion of the resulting methamphetamine cook. Even if Thompson cannot beyond a reasonable doubt be included in a larger Aryan Circle conspiracy, the evidence was sufficient to convict Thompson of a conspiracy to distribute more than fifty grams of methamphetamine.

Ford: Testimony established that Ford was not a member of

the Aryan Circle, but that he was a highly productive methamphetamine cook who regularly sold to the Aryan Circle members. Hines, Jr., testified that in January 2002 he began to buy a quarter ounce of methamphetamine per day from Ford. He testified that he saw Ford cook two to five ounces of methamphetamine on fifteen to twenty occasions at the houses of Hines, Jr., and Charles Samson. Wilkins testified that in the fall of 2002, he began to partner with Ford in cooking methamphetamine every other day for two-and-a-half to three months, approximately thirty-eight times in total. Each cook they did included over 3000 pills, yielding at least seven ounces of methamphetamine. Wilkins and Ford traded finished methamphetamine for precursors with Charles Samson and Shane Samson, among others. The evidence is clearly sufficient to establish that Ford took part in a conspiracy to distribute over fifty grams of methamphetamine.

Shane Samson: Hines, Jr., testified that Shane Samson obtained pills and batteries for methamphetamine cooks on a daily basis. Jordan testified that Shane Samson gathered pills and other precursors for Charles Samson and sold methamphetamine. Jordan and Wilkins testified that Shane Samson would receive a quarter ounce of methamphetamine for a thousand pills. Other witnesses testified that Shane Samson obtained pills for Wren, Barrandey, Ford, and Wilkins. Roger Bidwell ("Bidwell") and Catoe each testified that they purchased methamphetamine from Shane

26

Samson. The evidence is clearly sufficient to establish that Shane Samson took part in a conspiracy to distribute over 50 grams of a methamphetamine.

Griffith: It is undisputed that Griffith is a high-ranking member of the Aryan Circle. It is also undisputed that Griffith was incarcerated for the majority of the period covered by the indictment: from July 2, 2000, to July 10, 2002, and from September 21, 2002, through this trial. Multiple witnesses testified that Griffith was opposed to the Aryan Circle's involvement in the methamphetamine trade. But several witnesses also testified that Griffith sold methamphetamine during the two months that he was out of prison. Hines, Jr., testified that every day of the month-long period in which Griffith stayed at his house, he gave Griffith methamphetamine to sell and Griffith brought back money. Bidwell testified that Griffith sold methamphetamine from Bidwell's house on approximately five occasions over a two-week period. Jordan testified that after Griffith returned to prison, he told Jordan that he had sold and cooked methamphetamine while out. Accordingly, a reasonable jury could have concluded that Griffith took part in a conspiracy to distribute over 50 grams of methamphetamine.

Beason: Testimony indicated that defendant Beason prospected for thirty days with the Aryan Circle but was dropped. Evidence linking Beason with the methamphetamine trade is not vast. Hines, Jr., testified that Beason cooked methamphetamine on his property

27

three times, with yields of approximately half of an ounce of methamphetamine. On cross-examination, Hines, Jr., conceded that the first cook produced only about an eighth of an ounce. Bidwell testified that Beason sold him an "eight-ball," or an eighth of an ounce, of methamphetamine on one occasion. Martin testified that Beason once sold him a quart of anhydrous ammonia, which is capable of producing an ounce of methamphetamine when combined with other ingredients. Perkins testified that Charles Samson told him that Beason was going to do a cook for Samson to pay Samson the money he was owed, but there was no evidence presented indicating that this cook took place or the quantity owed. Jerry Witt testified that he once had a conversation with Beason about a technique for cooking methamphetamine.

Beason's involvement in the methamphetamine trade appears to have been sporadic, and he is directly linked with only small quantities of methamphetamine. Still, Beason's three cooks with Hines, Jr., who played a central role in the methamphetamine trade, testified to having cooked up to sixty ounces of methamphetamine, and was closely involved with Charles Samson, are enough to allow a reasonable jury to conclude that Beason was part of a larger methamphetamine conspiracy. Accordingly, there is sufficient evidence to link Beason with a conspiracy involving more than fifty grams of methamphetamine.

Martin: Numerous persons testified to defendant Martin's involvement with multiple levels of the methamphetamine trade.

Jordan testified that Martin cooked methamphetamine with Gary Martin and Rister and also sold methamphetamine. Barrandey testified that Martin got pills for him, went with him to get anhydrous, and helped him to cook. Hines, Jr., testified that Martin was among the members of the Aryan Circle who sold methamphetamine for Charles Samson. Perkins testified that Martin sold methamphetamine for him. Morris testified that on at least ten occasions, Martin gathered pills and other precursors for Tucker and Wilkins. Gary Martin testified that he and Martin cooked together on two or three occasions. Calvin Bailey testified that Martin sold methamphetamine from his house. This evidence is sufficient to link Martin with a conspiracy involving over fifty grams of methamphetamine.

3.   Sufficiency of the Evidence

Defendants Thompson, Shane Samson, Griffith, Beason and Martin argue that the evidence at trial was legally and factually insufficient to convict them of conspiracy to distribute more than fifty grams of methamphetamine or 500 grams of a substance containing methamphetamine. As the preceding section indicates in some detail, the evidence presented at trial was sufficient to convict each of these defendants.

**C. Denial of Continuance**

Defendant Thompson argues that the district court erred in denying his motion for continuance. Thompson argues that because his counsel was appointed ten days before trial, he did not have

29

adequate time to prepare for trial. This court reviews the district court's decision to grant or deny a continuance for abuse of discretion. United States v. Walters, 351 F.3d 159, 170 (5th Cir. 2003). Further, this court will order a new trial only where the defendant can show that he has suffered serious prejudice. United States v. Messervey, 317 F.3d 457, 462 (5th Cir. 2002). Factors to be considered where a party complains of inadequate preparation time include: (1) the amount of preparation time available, (2) whether the defendant took advantage of the time available, (3) the likelihood of prejudice from a denial, (4) the availability of discovery from the prosecution, and (5) the complexity of the case. United States v. Scott, 48 F.3d 1389, 1393 (5th Cir. 1995).

This case was indeed complex: it involved ten defendants, even more witnesses, and voluminous discovery. Ten days does appear to be an excessively short length of time to prepare a defense in such a case. Yet there is no evidence that Thompson was seriously prejudiced by the denial of his request for a continuance. Thompson's attorney effectively challenged the witnesses--including Baumgardner, Max Mays, and Hines, Jr.--who implicated his client, made intelligent arguments in his opening and closing statements minimizing Thompson's role, and benefitted from the arguments of other defense counsel challenging the credibility of witnesses and portraying the participants in the methamphetamine trade as fragmented and disorganized. We

30

therefore decline to order a new trial for Thompson.

**D. Breach of Plea Bargain**

Defendant Ford claims that by bringing against him the March 2004 indictment that lead to this trial, the government breached its earlier plea agreement with him stemming from a January 2003 indictment. In the January 2003 indictment, Ford and his wife were charged with one count of distributing methamphetamine on May 13, 2002, one count of possession with intent to distribute methamphetamine on May 16, 2002, multiple gun counts, and one count for having maintained a place for manufacturing and distributing methamphetamine from approximately May 13, 2002, to June 10, 2002. In March 2003, Ford pled guilty to one gun count pursuant to a plea agreement in which the government agreed to dismiss the other counts against him.

This court reviews a claim of breach of a plea agreement de novo, accepting the district court's factual findings unless clearly erroneous. United States v. Davis, 393 F.3d 540, 546 (5th Cir. 2004)(internal citations omitted). We apply general principles of contract law in order to interpret the terms of the plea agreement.  United States v. Cantu, 185 F.3d 298, 304 (5th Cir. 1999). The defendant bears the burden of demonstrating the underlying facts that establish the breach by a preponderance of the evidence. United States v. Wittie, 25 F.3d 250, 262 (5th Cir. 1994). To assess whether a plea agreement has been violated, this court considers "whether the government's conduct is consistent

31

with the defendant's reasonable understanding of the agreement."
United States v. Valencia, 985 F.2d 758, 761 (5th Cir. 1993).

The issue raised here by Ford is similar to that presented in Cantu. There, the appellant argued that the government alleged the same conduct in the possession count dismissed pursuant to his plea agreement and in the subsequent RICO count filed against him. 185 F.3d at 305. This court concluded that it was not reasonable for Cantu to believe that his plea agreement barred the government from bringing a different charge in a future prosecution. Id. We explained that "[t]he language of the plea agreement is narrowly worded, speaking only to the government's obligation to dismiss 'Count II of the First Superseding Indictment.'" Id. We further found that Cantu was not prejudiced, because although conduct that was the basis of the dismissed charge was incorporated into the later charge as an overt act, it was only one of nine overt acts presented by the government. Id. At trial, the government adduced sufficient evidence bearing upon the other eight overt acts to justify Cantu's conviction. Id.

Here Ford argues that his dismissed aiding and abetting charge was so similar to the conspiracy charge made in the March 2004 indictment as to preclude prosecution for that later charge. Ford also notes that count two of the March 2004 indictment includes as an overt act Ford's manufacture of methamphetamine on May 13, 2002, the same act that was a basis for his dismissed aiding and abetting charge. As in Cantu, however, Ford's plea

32

agreement does not contain any promise by the government not to prosecute Ford for a different crime arising out of facts from the first indictment. There is a substantial difference between Ford's aiding and abetting charge, which included only Ford's cooperation with his wife, and the March 2004 indictment, which alleged Ford's manufacture of methamphetamine for the Aryan Circle group over a much broader time span. Moreover, the testimony at trial focused not on Ford's manufacturing activities on or around May 13, 2002, but on his manufacture for Hines, Jr., and Charles Samson in January 2002 and with Wilkins in late November 2002 through mid January 2003. Consequently, there was no prejudice to Ford, and his conviction must stand.

**E. Challenges to Sentencing Enhancements**

### 1. Griffith and Martin

The district judge enhanced the sentences of defendants Griffith and Martin under U.S.S.G § 3B1.1 for leadership roles in the methamphetamine conspiracy. Griffith and Martin now raise two objections to their sentence enhancements: first, a Sixth Amendment objection to the judge's application of the mandatory Sentencing Guidelines; and, second, an objection to the sufficiency of the evidence underlying the enhancement.

At trial, both Griffith and Martin raised objections under Blakely v. Washington, 542 U.S. 296 (2004), to the district court's application of the Sentencing Guidelines, thus preserving their Sixth Amendment challenge under United States v. Booker,

33

543 U.S. 220 (2005). See United States v. Saldana, 427 F.3d 298, 313-14 (5th Cir. 2005). Where the Booker objection is preserved in the district court, we will vacate the sentence and remand, unless we can say that the error is harmless under Rule 52(a) of the Federal Rules of Criminal Procedure. United States v. Mares, 402 F.3d 511, 520 n.9 (5th Cir. 2005). The government bears the burden of showing that the error was harmless beyond a reasonable doubt. United States v. Pineiro, 410 F.3d 282, 285 (5th Cir. 2005). To show harmlessness, the government must demonstrate beyond a reasonable doubt that the Sixth Amendment error did not affect the sentence that the defendant received. Id.

At the sentencing hearings of both Griffith and Martin, the district court declared that in the event that the Sentencing Guidelines were declared unconstitutional, the court would award Griffith and Martin the same sentences as it did applying the Guidelines, 360 months and 210 months respectively. The government therefore meets its burden of showing that the district court's Sixth Amendment error was harmless. See Saldana, 427 F.3d at 314-15.

Griffith was given a four-level sentence enhancement under U.S.S.G § 3B1.1(a) for being "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." Griffith objected at trial that there was insufficient evidence to support this enhancement, and now raises this claim upon appeal. After Booker, we continue to review the

34

district court's interpretation of the Sentencing Guidelines de novo and its factual findings for clear error. United States v. Charon, 442 F.3d 881, 887 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 260 (2006). The sentencing judge is entitled to find by a preponderance of the evidence all the facts relevant to the determination of a Guidelines sentencing range. United States v. Johnson, 445 F.3d 793, 798 (5th Cir. 2006), *cert. denied*, 126 S. Ct. 2884 (2006).

Factors to be considered in identifying an organizer or leader include "the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others." U.S.S.G. § 3B1.1 cmt. n.4; United States v. Valdez, 453 F.3d 252, 263 (5th Cir. 2006), *cert. denied*, 127 S.Ct. 456 (2006). Applying these factors, it is clear that the evidence against Griffith falls short. While Griffith held a leadership position in the Aryan Circle organization, the record reveals that his involvement in the methamphetamine trade was minor. As described above, the evidence regarding Griffith's methamphetamine participation indicated that he sold methamphetamine fronted by Hines, Jr., for a month and sold methamphetamine from Bidwell's house on five occasions. There was

no evidence that Griffith exercised authority over either man in these transactions. There is no evidence that Griffith recruited accomplices or claimed a share of methamphetamine being produced and sold by other members of the Aryan Circle. There is also no evidence that Griffith took part in meetings at which arrangements were made for gathering precursors and setting up cooks.

The government points to evidence that Griffith told Hines, Jr., that he did not like Aryan Circle members diluting the methamphetamine that they sold to each other, and that he told Perkins that if Perkins was going to continue to sell methamphetamine, he needed to do it with his Aryan Circle brothers. The evidence strongly indicates, however, that this advice or instruction was not heeded, suggesting that Griffith did not exercise control or authority over these individuals with regard to the methamphetamine trade. The government also points to evidence that Griffith made threats against those members of the Aryan Circle who had agreed to testify in this case. Evidence implicating Griffith in threats of this kind is strong; however, the record as a whole shows that these acts were done to protect the Aryan Circle organization rather than to further the aims of a methamphetamine conspiracy. Griffith received a two-level sentence enhancement for obstruction of justice, so his conduct in this regard did not go unpunished.

Martin received a two-level enhancement under U.S.S.G.

§ 3B1.1(c) as an "organizer, leader, manager, or supervisor" in any criminal activity other than one that involved five or more participants or was otherwise extensive. Martin objected at trial that there is insufficient evidence to support this enhancement, and now renews this claim upon appeal. To qualify for an adjustment under this section, the defendant must have been the organizer, leader, manager, or supervisor of at least one other participant. U.S.S.G. § 3B1.1 cmt. n.2. Our sister circuit has held that instructing others to obtain precursors used to produce methamphetamine is evidence of a managerial or supervisory role for the purposes of § 3B1.1. United States v. Mesner, 377 F.3d 849, 851 (8th Cir. 2004).

Much of the testimony regarding Martin casts him in a subordinate role: Martin accompanied Rister to collect a drug debt; Martin obtained pills for Barrandey's cook; Martin sold methamphetamine for Charlie Samson and Perkins; Martin gathered pills and precursors for Tucker and Wilkins. There was some evidence that Martin was a methamphetamine cook. Gary Martin testified that he and Martin cooked together a couple of times, and Bidwell testified that he observed Gary Martin teaching Martin how to cook methamphetamine. This evidence suggests that Gary Martin, not Martin, took a managerial role in those cooks, and it does not indicate that Martin had persons obtaining precursors for those cooks. Jordan testified that he, Martin, and Barrandey brought anhydrous ammonia to Perkins' house, and that

they all then began to cook. This testimony does not indicate that Martin had a managerial role in that cook. Rister testified that he once saw Martin cooking methamphetamine "way out west of town." This testimony does not indicate that Martin was managing others in cooking or gathering precursors.[6]

In finding that Martin "did direct others to get precursors for methamphetamine," the district court appeared to rely on the statement by the United States attorney at the sentencing hearing that "Mr. Bailey testified extensively that . . . Mr. Martin would have Mr. Bailey gather up precursors on a regular basis for Mr. Martin." This is not an accurate reflection of Calvin Bailey's testimony. Bailey testified that Martin and Bailey's mother brought precursors to Bailey's house, cooked methamphetamine elsewhere, and then returned with finished methamphetamine. Bailey did not indicate that he or other persons were gathering precursors for Martin. Accordingly, we conclude that the district court clearly erred in enhancing Martin's sentence as an organizer, leader, manager, or supervisor.

2. Ford

The district court enhanced Ford's sentence on the basis that Ford was responsible for between five and fifteen kilograms of a substance containing methamphetamine. Citing Apprendi v. New

---

[6] At the sentencing hearing, the district court stated that Hines, Jr., testified that Martin cooked methamphetamine, but we have not found evidence of that testimony in the record.

*Jersey*, 530 U.S. 466 (2000), Ford objects that this enhancement violates his Due Process Clause and Sixth Amendment rights because it is based on facts not found by the jury. Here, however, the district court's determination did not increase Ford's sentence beyond the statutory maximum. 21 U.S.C. § 841(b)(1)(A) provides for a sentence of ten years to life for defendants convicted of distributing more than fifty grams of methamphetamine or 500 grams of a substance containing methamphetamine. Ford's sentence of 325 months in prison was thus within the prescribed range of penalties for which Ford could be held responsible based solely on the jury's finding. Consequently, there is no *Apprendi* error. Though Ford made a *Blakely* objection at trial, any *Booker* error is harmless because the district court stated that it would impose the same sentence in the event that the Guidelines were declared unconstitutional.

## IV. CONCLUSION

For the reasons stated above, we AFFIRM the convictions of Charles Samson and Victor Wesley Tucker of a continuing criminal enterprise involving more than 15,000 grams of methamphetamine. We REVERSE the conviction of Michael Curtis Lewis and Malachi David Wren for continuing criminal enterprise on the basis of insufficient evidence. We AFFIRM the convictions of Donnie Thompson, Michael Norris Martin, Buddy Ford, Leonard Duane Griffith, Shane Samson, and Jerry Wayne Beason for conspiracy to manufacture and distribute over fifty grams of methamphetamine or

39

500 grams of a substance or mixture containing methamphetamine. We REVERSE the enhancement of the sentences of Michael Norris Martin and Leonard Duane Griffith for leadership roles in the conspiracy on the basis of insufficient evidence but AFFIRM the enhancement of the sentence of Buddy Ford for his responsibility for between five and fifteen kilograms of a substance containing methamphetamine.

AFFIRMED in part and REVERSED in part. The sentences of Lewis, Wren, Martin, and Griffith are VACATED and the cause is REMANDED for their resentencing.