# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

October 15, 2010

No. 09-11035

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee,

v.

LUIS NAVA, also known as Flaco,

Defendant–Appellant.

Appeal from the United States District Court
for the Northern District of Texas

Before DENNIS, OWEN, and SOUTHWICK, Circuit Judges.

PRISCILLA R. OWEN, Circuit Judge:

Luis Nava appeals the district court's imposition of a three-point sentencing enhancement for his role as a manager or supervisor in a drug conspiracy. For the following reasons, we affirm.

## I

Nava, a member of the street gang known as the Almighty Latin King and Queen Nation (Latin Kings), was charged in Count One of an eleven-count superseding indictment with conspiracy to distribute and possess with intent to distribute five kilograms or more of cocaine and 100 kilograms or more of marijuana in violation of 21 U.S.C. §§ 846, 841(a)(1), (b)(1)(A)(ii) & (b)(1)(B)(vii). Nava initially pleaded guilty pursuant to a plea agreement. At the sentencing

hearing, Nava's attorney objected to the recommendation in the Presentence Investigation Report (PSR) that the three-point enhancement under United States Sentencing Guideline (U.S.S.G.) § 3B1.1(b) should be applied because Nava was a manager or supervisor in the conspiracy. Counsel asserted that there was no indication prior to the plea agreement that this enhancement would apply and that he had received no discovery showing that Nava had such a role. The court then allowed Nava to withdraw his guilty plea.

Nava later pleaded guilty to Count One of the superseding indictment, without a plea agreement. At the subsequent sentencing hearing, the district court heard testimony from two government witnesses with regard to Nava's role in the conspiracy. The court overruled Nava's objection to the three-point enhancement and determined that Nava's total offense level was thirty-eight. Since Nava had a criminal history category of I, this resulted in a guidelines range of 253 to 293 months of imprisonment. The court sentenced Nava to 264 months' imprisonment, followed by a five-year term of supervised release. Nava now appeals.

## II

We review the district court's interpretation of the Sentencing Guidelines de novo, and we review any factual determinations made in sentencing for clear error.[1] The determination that a defendant qualifies for an enhancement for his role as a manager or supervisor is a factual finding reviewed for clear error.[2] The court will find clear error in this regard "only if, based on the entire evidence, the court is left with the definite and firm conviction that a mistake has been committed."[3] "A factual finding is not clearly erroneous if it is plausible

---

[1] *United States v. Jeffries*, 587 F.3d 690, 692 (5th Cir. 2009).

[2] *See United States v. Rose*, 449 F.3d 627, 633 (5th Cir. 2006).

[3] *Id.* (internal quotation marks, brackets, and citation omitted).

in light of the record read as a whole."[4]  Factual findings must be supported by a preponderance of the evidence.[5]

## III

Nava argues that the district court clearly erred in determining that he was a manager or leader of the drug conspiracy.  He contends that there was insufficient evidence to support such a finding and that any evidence in support was unreliable.  The Government contends that the evidence is reliable and supports the enhancement.

U.S.S.G. § 3B1.1(b) provides for a three-level offense increase "[i]f the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive." The guidelines do not define "manager" or "supervisor," but the commentary does note that the defendant "must have been the . . . manager, or supervisor of one or more other participants."[6]  The application notes further provide that, in distinguishing a leadership and organizational role from one of mere management or supervision, the court should consider:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.[7]

The PSR contains the following evidence regarding Nava and the drug conspiracy.  It first explains that the Latin Kings have four regions in Texas and that each region has individual chapters of the gang.  The "Inca" is the gang

---

[4] *Id.* (internal quotation marks and citation omitted).

[5] *United States v. Rodriguez,* 602 F.3d 346, 362 (5th Cir. 2010).

[6] U.S. SENTENCING GUIDELINES MANUAL (U.S.S.G.) § 3B1.1 cmt. n.2 (2009).

[7] U.S.S.G. § 3B1.1 cmt. n.4.

member in charge of each chapter, and the second in command of the chapter is known as the "Cacique." The PSR states that Nava had been identified as a former "Cacique" for the Big Spring Chapter and as the Midland/Odessa "Inca." The Big Spring Chapter may have had up to forty total members. The PSR further states that this chapter distributed and/or acquired marijuana and cocaine throughout the state of Texas from approximately 2001 until December 2008; Nava's brother, Jose Nava, "led the show"; and Jose Nava directed a variety of individuals, including Luis Nava, in their drug trafficking activities.

In addition, the PSR states that the Big Spring Chapter purchased homes in Big Spring, seven of which were used by the this chapter to distribute drugs. Luis Nava ran one of those homes. Nava purchased cocaine from Celestino Hinojos and transported it to members of the Latin Kings in both Big Spring and Lubbock. He also distributed large quantities of cocaine in Midland and delivered some cocaine to Jose Nava. Other sections of the PSR similarly indicate that Luis Nava was distributing large quantities of cocaine and marijuana.

The PSR shows that Luis Nava gave orders to other Latin Kings. For instance, during a "war" with the Rios Family, a rival drug trafficking enterprise, Nava ordered Robert Allen Ramirez to burn down the home of Rios's mother. At another time, Nava ordered Guerrero Olivas and Domingo Robledo to set grass fires in a certain location to draw police attention. Nava also requested that his wife, Cecily Dominique Juarez, purchase Inositol, which is used to cut powder cocaine.

In addition, two witnesses at the sentencing hearing testified as to Nava's role in the offense. Billy Koontz, a police officer for the City of Lubbock and the task force officer with the Drug Enforcement Agency (DEA), testified first. He had been assigned to the investigation targeting Jose Nava and his drug trafficking organization. Koontz testified that Luis Nava had been present at

an internal meeting of the leadership of the Latin Kings, in which only "number ones" and regional officers had been allowed.  Koontz was shown photographs of the meeting and pointed out Nava in the photographs.  Koontz testified that the transcript and photographs from the meeting showed that, when someone asked who was closest to El Paso, Jose Nava pointed at Luis Nava and said "he's got regional," meaning that he was in charge of the region closest to El Paso.

Koontz also testified extensively as to Nava's involvement in drug trafficking.  He explained that when Nava and his brother Jose moved to Big Spring in 2003, they met Joe Canales, and Canales began to supply them with marijuana.  He stated that Canales and Jose Nava became partners, but that Luis and a third brother, Reynaldo Nava, were also involved in the drug trafficking, which grew to include cocaine.  Koontz further explained that in 2007, Jose and Luis Nava started obtaining drugs from a new source, Celestino Hinojos, who would at times supply them with nine kilograms of cocaine.  In addition, Koontz testified about an interview he had with Carol Nava, the wife of Reynaldo.  Koontz stated that she told him that she learned to dilute cocaine from watching Luis Nava.

Probation officer Wayne McKim also testified at the sentencing hearing. McKim testified that when interviewing Nava, he noticed one of Nava's tattoos and asked him about it.  McKim testified that Nava explained it was a tattoo showing rank and that his brother, Jose Nava, had no rank in the Latin Kings.

## A

Nava makes many objections to the reliability of the evidence, but they are unavailing.  In making factual findings for sentencing purposes, the district court may consider any evidence "which bears sufficient indicia of reliability to support its probable accuracy, including hearsay evidence."[8]  If the defendant

---

[8] *United States v. Solis*, 299 F.3d 420, 455 (5th Cir. 2002) (internal quotation marks and citation omitted); *see also* U.S.S.G. § 6A1.3(a) ("In resolving any dispute concerning a factor

takes issue with the evidence, he "bears the burden of demonstrating that the information cannot be relied upon because it is materially untrue, inaccurate or unreliable."[9]  A presentence report "generally bears sufficient indicia of reliability to be considered as evidence by the sentencing judge in making factual determinations."[10]  Again, the defendant bears the burden of showing that the information in the presentence report is materially untrue.[11]

Nava has not shown that the information introduced at sentencing or contained in the PSR is untrue.  He first argues that the information contained in the PSR is not reliable since the PSR does not cite specific sources for the information.  The PSR provides that the information contained within it was gathered from:

> the Factual Resume prepared by the U.S. Attorney's Office, Lubbock, Texas, and investigative materials prepared by the Lubbock Police Department (LPD), Lubbock, Texas; the Lubbock County Sheriff's Office, Lubbock, Texas; the Big Spring Police Department (BSPD), Big Spring, Texas; the U.S. Drug Enforcement Administration, Lubbock, Texas; the U.S. Drug Enforcement Administration, Houston, Texas; the Bureau of Alcohol, Tobacco, Firearms, and Explosives, Lubbock and Houston, Texas; the Dawson County Sheriff's Department, Lamesa, Texas; and the Federal Bureau of Investigation, Houston, Texas.

It further provides that "DEA Task Officer Billy Koontz was consulted."  Nava does not explain why these sources are unreliable.  Because a PSR generally bears sufficient indicia of reliability and because Nava has not provided rebuttal

---

important to the sentencing determination, the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy.").

[9] *Rodriguez*, 602 F.3d at 363 (internal quotation marks and citation omitted).

[10] *United States v. Trujillo*, 502 F.3d 353, 357 (5th Cir. 2007).

[11] *United States v. Valdez*, 453 F.3d 252, 262 (5th Cir. 2006).

evidence to show that the PSR and its sources are unreliable, the district court's reliance on it was not in error

Nava also contends that the evidence presented at the sentencing hearing did not have sufficient indicia of reliability since most of the testimony was "uncorroborated hearsay." The sentencing guidelines provide that "the court may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy."[12] The commentary further provides that "[r]eliable hearsay may be considered."[13] We have explained that even uncorroborated hearsay may be considered as long as it has sufficient indicia of reliability.[14]

Nava has not shown that the evidence alleged to be hearsay was unreliable. Much of the hearsay evidence consisted of Koontz's statements about what was said during the universal meeting of the Latin Kings leadership. But these statements were corroborated by the draft transcript of the meeting and the photographs of the meeting, and thus have sufficient indicia of reliability. As for Carol Nava's statements to Koontz, Nava made no showing as to why these statements are unreliable. In addition, Nava takes issue with his own statement to McKim that his tattoo showed he had rank in the Latin Kings. Because this statement is an admission by a party-opponent, it is not hearsay under Federal Rule of Evidence 801(d)(2).

In sum, Nava has presented no evidence to rebut the information in the PSR or the testimony in the sentencing hearing, and he has made no showing

---

[12] U.S.S.G. § 6A1.3(a).

[13] U.S.S.G. § 6A1.3 cmt.

[14] *United States v. Slaughter*, 238 F.3d 580, 585 (5th Cir. 2000) (per curiam).

that the evidence is not sufficiently reliable.  The district court did not err in considering the PSR and testimony in making its sentencing determination.

**B**

Nava next argues that the district court's finding that he was a manager or supervisor is not plausible in light of the record.  The evidence shows that Nava ranked second in the Big Spring Chapter, which had approximately forty members, and that he gave orders to gang members on at least two occasions.  The record also reflects that Nava was heavily involved in the drug trade—he bought and sold large quantities of drugs and ran a drug house.  In addition, the PSR shows a strong connection between the Big Spring Chapter chapter of the Latin Kings and the drug trade.  It states that from 2001 until 2008, the chapter distributed marijuana and cocaine throughout Texas, and that its drug trafficking increased dramatically in 2005.  Because of the increase, gang members conducted counter-intelligence and infiltrated the police.  Big Spring Chapter members also ran drug houses and engaged in war with rival drug enterprises.

Nava contends, however, that leadership in a gang cannot be equated to leadership in a drug conspiracy in which the gang is involved, pursuant to our ruling in *United States v. Lewis*.[15]  There, we considered whether a four-point sentencing enhancement for being an "organizer or leader" in a methamphetamine conspiracy was appropriate for the defendant, who had a leadership role in the Aryan Circle.[16]  In ruling that the evidence did not support the sentencing enhancement, we explained that the record showed that the

[15] 476 F.3d 369, 389 (5th Cir. 2007).

[16] *Id.*

defendant's role in the methamphetamine trade was minor, since it showed only that he sold methamphetamine for one month and on five other occasions.[17]

This case is distinguishable from *Lewis*. One basis is that in *Lewis* the defendant received a four-point sentencing enhancement for being an "organizer or leader," rather than the three-point enhancement for the lesser role of "manager or supervisor."[18] As mentioned *supra*, the application notes to § 3B1.1 list certain factors to be considered in distinguishing an organizer or leader from a manager or supervisor, and in *Lewis*, the court found that the evidence did not show that the defendant was an organizer or leader under the factors.[19]  But here, Nava was charged with being only a manager or supervisor.  The present case is also distinguishable from *Lewis* because the evidence shows that Nava had much more involvement in drug trafficking than did the defendant in *Lewis*. Nava was in charge of a drug house and bought and distributed large quantities of cocaine and marijuana throughout 2008.  Thus, the inference that Nava's leadership role in the Big Spring Chapter translated into a leadership role in the drug conspiracy requires less of a logical leap.

The evidence shows that Nava ranked second in the Big Spring Chapter, this chapter was highly connected to drug trafficking, and Nava frequently trafficked large quantities of drugs.  This creates a permissable inference that Nava's leadership position in the Big Spring Chapter translated into a leadership position in the drug trafficking enterprise.  The district court's determination that Nava was a manager or supervisor in the drug trafficking conspiracy involving Big Spring Chapter members is plausible in light of the record.

---

[17] *Id.*

[18] *Id.*

[19] *Id.*

No. 09-11035

*    *    *

For the foregoing reasons, we AFFIRM the district court's judgment.