# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 29, 2008

Charles R. Fulbruge III
Clerk

————

No. 06-10176

————

UNITED STATES OF AMERICA

Plaintiff - Appellee

v.

IHSAN ELASHYI, also known as Sammy Elashyi; HAZIM ELASHI; BAYAN
ELASHI; BASMAN ELASHI; GHASSAN ELASHI

Defendants - Appellants

————

Appeals from the United States District Court
for the Northern District of Texas

————

Before JOLLY, BARKSDALE, and HAYNES, Circuit Judges.

HAYNES, Circuit Judge.

Defendants Ihsan Elashyi, Hazim Elashi, Bayan Elashi, Basman Elashi,
and Ghassan Elashi[1] were convicted of illegally exporting computer equipment
to Libya and Syria, conspiracy to illegally export computer equipment,
laundering funds derived from the export violations, making false statements on
export documents, conspiracy to make false statements on export documents,
dealing in property of a Specially Designated Terrorist, and related offenses.
Defendants each raise several challenges to their convictions.  As to the

———————————

[1]  For clarity, we refer to Defendants throughout this opinion using their first names.

prosecution against Ihsan, we REVERSE, based upon a prior plea agreement with the Government. In all other respects, we AFFIRM.

## I. FACTUAL AND PROCEDURAL HISTORY

Defendants are five brothers who ran a small, family-owned computer business. Born in the Gaza Strip, they moved to Saudi Arabia, and then to Egypt, and ultimately to the United States. Their business partnership started in California in the 1980s when Bayan and Ghassan formed International Computers and Communications, which exported computers to the Middle East, and which each brother eventually joined. In 1992, all five Defendants relocated to Texas, where they formed InfoCom. Bayan was CEO; Ghassan was Vice President of Marketing; Hazim and Ihsan were salesmen and provided technical support; and Basman was Logistics Manager. The underlying events leading to the conviction of Defendants fall into two categories: (1) violations relating to export regulations; and (2) transactions in the property of a specially designated terrorist.

A. Export Transactions

Defendants were accused of engaging in a number of export transactions that form the basis for their convictions.

1. Shipments to Libya Through Malta

In early November 1996, Ghassan met with Yousef Elamri at a computer conference in Dubai, United Arab Emirates. Elamri owned a computer company in Libya called Computers & Information Technology ("CIT"). Although CIT maintained no independent, physical presence in Malta, it hired a Maltese company, Medfinco, to perform "nominee services" on its behalf. Employees of Medfinco answered the phone for CIT and forwarded any messages to Libya, and CIT used Medfinco's Malta address as its own.

InfoCom made four shipments to CIT via Malta. The first was on March 5, 1997. InfoCom filed a Shipper's Export Declaration ("SED") for that shipment

2

in which it declared that SMS Air Cargo was the ultimate consignee and that Malta was the ultimate destination. InfoCom shipped additional computer goods to CIT via Malta on March 7, June 6, and July 16, 1997.

2.      Shipments to Libya Through Rome

In June and July 1999, InfoCom made three shipments to Rome. Defendants' brother-in-law, Khaled Bugrara, ordered the goods. Khaled was a naturalized citizen, computer science professor, and owner of a computer company in Massachusetts.

Nureddin Abugrara, Khaled's brother, lived in Libya. In 1995, with Khaled's assistance, Nureddin established a computer business in Libya called Namatel. Khaled purchased computer equipment for Nureddin, including computers from InfoCom, that Khaled personally delivered to Nureddin in Libya in 1995. In 1999, Khaled again ordered computer goods from Infocom. InfoCom sent these goods in three shipments, on June 25, June 30, and July 2, 1999, each addressed to the Rome airport on behalf of Nureddin. The shipments were collected and held by a customs clearing agent at the airport. Nureddin then picked them up and took them back to Libya. The SEDs InfoCom filed with the first two shipments listed Nureddin as the ultimate consignee and Italy as the ultimate destination.

3.      Shipments to Syria

InfoCom sent four shipments to Syria on the following dates: May 14, 1998; March 19,1999; April 6, 1999; and July 31, 2000. For each shipment, InfoCom was required to obtain a transaction-specific license from the Commerce Department. It failed to do so. In addition, InfoCom filed SEDs with the March 19, 1999 and April 6, 1999 shipments declaring that no license was required and understating the values of goods being exported.

B.    Transactions in Property of Mousa Abu Marzook

Separate from the export transactions, some of the Defendants were also accused of dealing in the property of a specially designated terrorist. Mousa Abu Marzook, a leader of Hamas, is married to Defendants' cousin, Nadia Elashi. Many years ago, Marzook made multiple investments in Defendants' computer businesses. Relevant to the present case, Marzook loaned InfoCom $150,000 in July 1992. InfoCom paid Marzook two interest payments during 1992.

In February 1993, the New York Times published a front-page article reporting that Marzook was a leader of Hamas. Two days later, Nadia moved several hundred thousand dollars from the United States to a bank account for Marzook in the United Arab Emirates. Sometime during the next several weeks, InfoCom drafted a "Murabaha Agreement," a form of investment contract under Islamic law, providing that Nadia would invest $250,000 in InfoCom. The agreement was for a term of one year and was renewable by the parties. Bayan signed for InfoCom; Nadia signed for herself; and Marzook signed as a "witness."

The evidence at trial indicated that Nadia never made a payment to InfoCom under the Murabaha Agreement. The first $150,000 of the $250,000 investment was satisfied by Marzook's prior loan. In preparing its annual ledger for 1993, InfoCom deleted Marzook's name from its books and attributed his $150,000 payment to Nadia. The remaining $100,000 came in two installments. On March 25, 1993, two days after the Murabaha Agreement was executed, InfoCom deposited a $50,000 check from Marzook. InfoCom labeled the check "Marzook" on the deposit slip, but recorded it on its books as a loan from Nadia. On April 16, 1993, InfoCom received approximately $50,000 from an unknown source, which it also recorded on its books as a loan from Nadia.

From May 1993 through 2001, InfoCom sent Nadia interest payments. The payments were often for $3,000, but varied from $1,000 to $15,000.

Whether sent to Marzook or Nadia, all payments from September 1992 to June 1995 were deposited in their joint bank account.

In July 1995, Marzook was arrested while entering the country. On August 16, 1995, the Department of the Treasury's Office of Foreign Asset Control ("OFAC") designated Marzook as a Specially Designated Terrorist ("SDT"). 60 Fed. Reg. 44932 (Aug. 29, 1995). After that date, no person in the United States could, without a license from OFAC, lawfully deal in the property of Marzook. 60 Fed. Reg. 5079 (Jan. 23, 1995); see also 31 C.F.R. §§ 595.201(a), 595.204.

Nadia did not receive payments July through October 1995. In November 1995, the payments resumed, but were deposited into a bank account that Nadia opened in her name. The payments continued until September 2001, when OFAC issued a blocking order directing InfoCom's banks to freeze funds in which OFAC determined Marzook had an interest.

C.    Proceedings in District Court

On August 21, 2003, a federal grand jury in the Northern District of Texas returned a 46-count second superseding indictment ("Indictment"). Counts 1 through 25 charged violations associated with Defendants' computer export business under the Export Administration Regulations ("EAR"), 15 C.F.R. pts. 730-774 (2007), Libyan Sanctions Regulations ("LSR"), 31 C.F.R. pt. 550 (2003), and International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1707 (2006).[2]    Counts 26 through 46 charged three of the

---

[2] Count 1 charged Defendants with conspiracy to violate EAR and LSR in connection with their export of computer goods to Libya and Syria. Counts 2 through 6 charged Defendants with substantive export violations regarding computer goods exported to Libya, and Count 7 charged them with making a false statement on a SED about the true destination of goods exported to Libya. Counts 8 through 11 charged Defendants with violating licensing requirements for computer goods exported to Syria; Counts 12 and 13 charged them with making false statements on SEDs regarding those licensing requirements and the value of the exported goods; and Count 14 charged them with laundering funds derived from the export violation charged in Count 10. Count 15 charged Defendants with conspiracy to make false

Defendants–Bayan, Ghassan, and Basman–with dealing in property of an SDT and related offenses in violation of Executive Order 12947 and the IEEPA.[3] See 50 U.S.C. §§ 1701-1707; 60 Fed. Reg. 5079; 31 C.F.R. §§ 595.201(a), 595.204.

The district court severed the charges in the Indictment and ordered separate trials on Counts 1 through 25 and Counts 26 through 46. In the first trial, the jury convicted Ihsan on Counts 1-2, 7-9, 11, 15-19, 21, 23-25; Hazim on Counts 1, 4-6, 10, 13-15, 20, 22; Bayan on Counts 1-2, 4-6, 8-10, 13-15, 22; Basman on Counts 1-2, 4-11, 13-25; and Ghassan on Counts 1, 10, 13-15, 20. Defendants filed joint post-trial motions for judgments of acquittal and new trial, which the court denied. In the second trial, the jury convicted Bayan and Ghassan on Counts 26-46 and Basman on Counts 26, 27, and 37. Following trial, Defendants moved for judgments of acquittal, which the district court denied. These consolidated appeals followed.

## II. SUFFICIENCY OF THE EVIDENCE

### A.    Standard of Review

Hazim, Bayan, Basman, and Ghassan each challenge the sufficiency of the evidence in support of their convictions. This court's review of the sufficiency of the evidence is "'highly deferential to the verdict.'" United States v. Gulley, 526 F.3d 809, 816 (5th Cir.), cert. denied, 129 S. Ct. 159 (2008), (quoting United States v. Harris, 293 F.3d 863, 869 (5th Cir. 2002)). "The court asks 'whether the evidence, when reviewed in the light most favorable to the [g]overnment with all reasonable inferences and credibility choices made in support of a conviction, allows a rational fact finder to find every element of the offense beyond a

---

statements on SEDs about the value of goods exported to countries other than Libya and Syria, and Counts 16 through 25 charged Defendants with substantive false-statement offenses regarding those SEDs.

[3] Count 26 charged conspiracy to deal in property of an SDT. Counts 27 through 36 charged substantive violations of that prohibition. Counts 37 through 46 charged conspiracy and substantive money-laundering offenses related to the SDT violations.

reasonable doubt.'" Id. (quoting Harris, 293 F.3d at 869). The inquiry is not whether the court would have returned the same verdict, but whether a rational jury could have found Defendants guilty beyond a reasonable doubt. Id. Even under our deferential standard of review, a conviction may not be affirmed on appeal based on evidence that merely creates the inference that a defendant might be guilty. This Court has explained that "[i]f the evidence tends to give equal or nearly equal circumstantial support to guilt and to innocence . . . reversal is required: When the evidence is essentially in balance, a reasonable jury must necessarily entertain a reasonable doubt." United States v. Ortega-Reyna, 148 F.3d 540, 543 (5th Cir. 1998) (internal quotations omitted).

B.    Export Convictions

In 1979, Congress enacted the Export Administration Act of 1979 ("EAA"), Pub. L . No. 96-72, 93 Stat. 503 (1979). The EAA authorized the Secretary of Commerce to issue regulations prohibiting or curtailing exports in order to protect or further the national security, foreign policy, or short-supply interests of the United States. 50 U.S.C. app. §§ 2404-2406; United States v. Dien Duc Huynh, 246 F.3d 734, 747 (5th Cir. 2001). To carry out those functions, Commerce promulgated the Export Administration Regulations ("EAR"), which set forth exporters' obligations. See 15 C.F.R. pts. 730-774 (2007).

1.    Shipments to Libya

Libya was at all relevant times subject to export restrictions under EAR as a designated State Sponsor of Terrorism. In addition, pursuant to Executive Order 12543, OFAC promulgated additional Libyan Sanctions Regulations. See 31 C.F.R. pt. 550 (2003); 51 Fed. Reg. 875 (Jan. 7, 1986). At all relevant times, LSR provided:

> Except as authorized, no goods, technology (including technical data or other information) or services may be exported to Libya from the United States, except publications and donated articles intended to

relieve human suffering, such as food, clothing, medicine and medical supplies intended strictly for medical purposes.

31 C.F.R. § 550.202. Defendants were charged with willfully violating section 550.202. Accordingly, as to the Libyan shipments, the Government had to prove that: 1) Defendants knowingly exported goods, technology, or services from the United States to Libya; 2) the goods, technology, or services were not intended to relieve human suffering; and 3) Defendants knew that they were prohibited from exporting goods to Libya. See 31 C.F.R. § 550.202; United States v. Sipe, 388 F.3d 471, 479-80, 480 n.21 (5th Cir. 2004) (approving of jury instruction that an act is done willfully if "it is done voluntarily and intentionally and with the specific intent to do something the law forbids").

### a. Shipments to Libya through Malta

There is no real dispute that Defendants' company, InfoCom, exported computer goods and technology that ultimately reached Libya, nor is it disputed that the computer goods were exported for commercial, not humanitarian, purposes. Basman and Bayan argue that there was insufficient evidence that they knew the shipments routed through Malta were destined for Libya.[4] Defendants argue that Elamri fooled them by virtue of CIT's nominal presence in Malta.

The evidence at trial revealed that Ghassan met Elamri in Dubai, which is where the business relationship between Defendants and Elamri began. On February 28, 1997, Elamri sent Ihsan a fax on CIT letterhead with CIT's Libyan phone and fax numbers, including the unique country code for Libya. Basman then entered CIT's contact information into InfoCom's client database using CIT's real contact numbers in Libya, but later changed CIT's contact information to reflect only the Malta phone and fax numbers. During this time, InfoCom

---

[4] Ihsan does not challenge any of his convictions on sufficiency grounds. Hazim and Ghassan were not convicted on substantive charges related to the shipments through Malta.

applied on behalf of CIT to register the top-level country domain for Libya. Bayan, who was responsible for internet matters, called CIT's number in Malta on May 14, 1997 while he was attempting to register the Libyan domain name. On the application for the Libyan domain name, InfoCom listed a Libyan administrative contact. On July 2, 1997, InfoCom again received a fax from CIT bearing CIT's Libyan contact information. InfoCom continued to solicit and do business with CIT. It was not until October 1, 1997, when Aries Freight discovered and told InfoCom that CIT was operating out of Libya, that InfoCom stopped doing business with CIT.

In addition to this evidence, the jury was provided incriminating faxes from InfoCom to CIT stressing the need for all communications and goods to pass through Malta. On April 14, 1997, Ihsan sent a fax to CIT with the message: "We have no problem doing business with you in Malta. As long as all faxes and letters and shipping are done to Malta....!!!" (emphasis added). Similarly, on August 29, 1997, Ihsan sent another fax to CIT thanking Elamri for his telephone call and stating, "We value you and would like to continue all business relations with your respectable company as long as we go through Malta at all time [sic].!!" (emphasis added). The jury could reasonably infer that Defendants knew Malta was merely being used to evade the prohibition on exporting to Libya.

The circumstances surrounding the shipments to Malta provide further support for Defendants' convictions. The Government offered evidence that Malta was a renowned transshipment point for goods destined for other locations in the region. InfoCom did not ship to CIT in Malta, but to a freight forwarder there, SMS Air Cargo. A reasonable jury could have inferred that Defendants were aware that CIT did not have an actual presence in Malta and that Malta was not the final destination for the goods shipped.

Basman and Bayan complain that they were convicted based on their family and business relationships. In particular, they argue that much of the evidence described above is not directly tied to either of them. Although Basman and Bayan are correct that they could not be convicted based only on their associations with the other Defendants, a reasonable jury could infer from Defendants' close relationship and positions of responsibility in InfoCom that they were not ignorant of each other's conduct or the circumstances surrounding the transactions with CIT. See United States v. Loe, 262 F.3d 427, 433 (5th Cir. 2001) ("A reasonable inference from the testimony about [the defendant] being the 'heir apparent' of the marina business and from the job descriptions and other evidence indicating [the defendant's] level of responsibility at the marina is that he knew about the underreporting of boat sales."). Bayan was the CEO of InfoCom. Basman was Logistics Manager, which, among other things, made him responsible for the shipping process.

In addition, there was directly incriminating evidence that Basman and Bayan filed false affidavits with Commerce in 2002 concerning the shipments to CIT. In those affidavits, they claimed that InfoCom discovered that CIT was in Libya while the last shipment was en route in July 1997, and that they immediately recalled that shipment and stopped doing business with CIT. The evidence at trial, however, showed that InfoCom continued to solicit business from CIT until October 1997, InfoCom never attempted to recall that shipment, and Federal Express instead completed its delivery. As this Court has explained, "[p]erhaps the strongest evidence of a criminal defendant's guilty knowledge is inconsistent statements to federal officials." United States v. Diaz-Carreon, 915 F.2d 951, 954-55 (5th Cir. 1990).

Given our deferential standard of review, the evidence was sufficient for a rational trier of fact to find beyond a reasonable doubt that Bayan and Basman knew the shipments routed through Malta were destined for Libya.[5]

### b.     Shipments to Libya through Rome

Hazim and Bayan each argue that there was not sufficient evidence that they knew that the shipments routed through Rome were destined for Libya or arrived there.[6] In addition, Bayan contends that the evidence was insufficient to show that he had any role in the transactions.

The evidence established that the June and July 1999 shipments went to Libya. Khaled Bugrara's uncontradicted testimony was that "[m]y brother Nureddin would travel to Italy and he would pick them up and take them home with him, back to Libya." It is undisputed that Nureddin lived in and operated a computer company out of Libya.

There also is sufficient evidence that Hazim knew the computers were going to Libya. Khaled, who ordered computers for Nureddin, worked directly with Hazim. Khaled was both Hazim's relative and a good friend. Khaled told Hazim that Nureddin was living in Libya and that Khaled was helping Nureddin

---

[5] Basman was also convicted on Count 7 of making a false statement about destination and value in the SED filed for the March 5, 1997 shipment to CIT. For the reasons discussed above, there was sufficient evidence for a reasonable jury to conclude that Basman knew, contrary to his statement in the SED, that Libya was the shipment's ultimate destination.

[6] Neither Ihsan nor Ghassan were convicted on substantive charges related to the shipments through Rome. While Basman specifically discusses the shipment of computers through Malta in his opening brief, he makes no such argument concerning goods shipped through Rome. The only argument made by Basman is the statement that "[t]he evidence was insufficient to sustain a conviction on any count." In his Reply Brief, Basman asserts for the first time that Khaled Bugrara, the Government's witness who testified that the Rome shipments were for his brother Nureddin, did not testify to having any contact with Basman. An appellant that fails to adequately brief an issue in his opening brief waives that issue. FED. R. APP. P. 28(a)(9)(A); United States v. Pompa, 434 F.3d 800, 806 n.4 (5th Cir. 2005). This issue should have been raised in Basman's opening brief, and therefore has been waived.

establish a computer business there. Hazim knew that the InfoCom goods ordered by Khaled were being shipped to Nureddin.

The evidence also established that Bayan knew Khaled was in Libya. Bayan knew Khaled had previously purchased computers from InfoCom for Nureddin in Libya. Khaled contacted Bayan about registering a Libyan domain name, and Khaled gave Bayan Nureddin's name and address in Libya. Bayan submitted an application to register the domain name, and as part of the application listed Nureddin's Libyan address and phone and fax numbers as the administrative contact. As with the shipments through Malta, there is sufficient evidence to support the jury's verdict concerning the shipments through Rome.

2.    Shipments to Syria

Basman, Hazim, Ghassan, and Bayan challenge their convictions for exporting computer goods to Syria without the required export license. As a designated State Sponsor of Terrorism, Syria was at all relevant times subject to export restrictions under EAR. Under those restrictions, it was unlawful to export certain goods, including almost any computer, to Syria without a transaction-specific license. See, e.g., 15 C.F.R. § 742.9 (2000). Willful violations of export restrictions to Syria are subject to criminal penalties under EAR. See 15 C.F.R. § 764.3(b). Accordingly, as to the Syrian shipments, the Government had to prove that Defendants: 1) knowingly exported computer goods from the United States to Syria; 2) the computer goods were exported without a license; and 3) Defendants knew that they were prohibited from exporting computer goods to Syria without a license. See 15 C.F.R. § 742.9; Sipe, 388 F.3d at 480 n.21.

Basman contends that the evidence was insufficient to show that he knew licenses were required. Basman was well educated and had been exporting computer equipment to the Middle East for more than a decade. The company he ran with his brothers identified the Middle East generally, and Syria

12

specifically, as a market for computer goods. In such a highly regulated industry, that would have brought obvious export restrictions to Basman's attention. Basman's guilty knowledge can also be inferred from his explanation for why InfoCom did not get licenses in his affidavit to Commerce. Basman stated in his affidavit that Trans-Trade, which assisted with the shipment, did not express doubts or reservations about the ability to make the shipment without an export license. In fact, Trans-Trade repeatedly raised concerns about the shipment. Basman also entered false and deceptive information on the export documents in ways that could have helped obscure that licenses were required. Basman's false statements "provide[] persuasive circumstantial evidence of [his] consciousness of guilt." Diaz-Carreon, 915 F.2d at 955.

Basman argues that he acted in good faith based on selected pages of the regulations that were faxed to him by Trans-Trade. Basman testified that he could not read the last category on the chart, which contained the relevant restrictions. Although the restrictions were partially obscured, it was clear from the document that the obscured information would have applied to shipments to Syria and should have been consulted absent willful blindness. Additionally, Basman failed to provide this explanation in his Commerce affidavit although he purported to explain why he did not believe that a license was required. There was sufficient evidence for a reasonable jury to have concluded that Basman knew that a license was required for shipments to Syria.

Hazim and Ghassan also contend that there was no evidence that they were aware of or intentionally disregarded export licensing requirements. There is no question that both Hazim and Ghassan were directly involved in the transactions, as they both had extensive contact with the customer. The only issue is whether they knew an export license was required. Both had significant experience exporting computers to the Middle East and worked in a small family run business that specifically targeted Syria as a market. In addition, the

question whether these computers required a license was not a close one; a transaction-specific license was required to export any but the most antiquated computers to Syria, and the computers InfoCom exported were then-current technology. Under these circumstances, a reasonable jury could conclude that Hazim and Ghassan were aware or deliberately ignorant of the export licensing requirements. See United States v. Butler, 429 F.3d 140, 152-53 (5th Cir. 2005) (holding that reasonable jurist could conclude from defendant's experience and position that he would have known virus had to be labeled as dangerous). Given our deferential standard of review, we hold that there was sufficient evidence for a reasonable jury to conclude that Hazim and Ghassan knew about the licensing requirements.

Finally, Bayan asserts there is no evidence that he was personally involved with any of the relevant shipments to Syria. The Government lacks direct evidence that Bayan was involved in the actual sale of computer equipment, but there was substantial evidence that Bayan worked with the client that received the goods. Given Bayan's position within InfoCom and his relationship with the client, we hold that there was sufficient evidence for a reasonable jury to conclude that he participated in the shipments to Syria.

3.    Conspiracy to Violate Export Laws

Basman, Hazim, Ghassan, and Bayan contend the evidence failed to prove they conspired to violate the export laws. They contend that they were convicted based solely on their family and business relationship, and that this mere "association" evidence is insufficient to support their convictions.

> In order to prove conspiracy pursuant to 18 U.S.C. § 371, the Government must prove "(1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy."

United States v. Floyd, 343 F.3d 363, 370 (5th Cir. 2003) (quoting United States v. Peterson, 244 F.3d 385, 389 (5th Cir. 2001)). "[A] general guilty verdict on a multiple-object conspiracy [charge] may stand even if the evidence is insufficient to sustain a conviction on one of the charged objects." United States v. Calle, 120 F.3d 43, 45 (5th Cir. 1997). The evidence only needs to be sufficient to support a conviction for one of the charged objects. Id.

Defendants are correct that presence or association, standing alone, does not support their convictions. See United States v. Soape, 169 F.3d 257, 264 (5th Cir. 1999). However, this court has also held that "when inferences drawn from the existence of a family relationship or mere knowing presence are combined with other circumstantial evidence, there may be sufficient evidence to support a conspiracy conviction." Id. (quotation marks omitted). In the present case, there is sufficient evidence to support a conviction for conspiracy.

First, as discussed above, there is some evidence of each of Defendants' involvement in the offenses that were the object of the conspiracy. Each of the Defendants played different but necessary roles in each transaction. Bayan was InfoCom's founder and CEO, Ghassan was Vice President of Marketing, Hazim was a technical expert and salesperson, and Basman was Logistics Manager. InfoCom, the company that Defendants started, developed a business plan targeting the Middle East, specifically including Syria, as a potential market. In addition, Defendants had a deep familial relationship.

Based on the totality of the evidence, including Defendants' knowing participation in the illegal transactions, their family and business history, the intimate nature of their small, family-run business, and their roles and experience in the business, a reasonable jury could infer that Defendants agreed to export goods to Libya and Syria in violation of the Libyan embargo and the licensing requirements of EAR.

C.    Filing and Conspiracy to File SEDs with False Values for Goods Being Exported to Countries Other than Libya and Syria

Basman, Hazim, Ghassan, and Bayan challenge their conspiracy and substantive false-statement convictions regarding SEDs filed with understated values for goods exported to countries other than Libya and Syria. The elements of a false statement offense are: "(1) a statement, (2) falsity, (3) materiality, (4) specific intent, and (5) agency jurisdiction." United States v. Leal, 30 F.3d 577, 584 (5th Cir. 1994); see also 18 U.S.C. § 1001.

Basman argues that the evidence was insufficient to show he actually made a false statement because some of the SEDs were signed by the freight forwarding companies rather than by Basman personally. This argument is without merit. In interpreting similar false statement statutes, this court has held that a defendant need not personally make the false statement; it is sufficient that he intentionally caused the false statement to be made. See United States v. Hopkins, 916 F.2d 207, 216 (5th Cir. 1990); United States v. Austin, 585 F.2d 1271, 1277 (5th Cir. 1978). There is evidence that Basman either signed SEDs himself or had the freight forwarder sign them on his behalf using false values Basman provided and intended to be used.

Basman also contends that the Government failed to prove the misstatements on the SEDs were material, arguing that values on SEDs are relevant only to calculating the United States trade deficit and that the total of the misstatements was not material to that amount. The test for materiality under 18 U.S.C. § 1001 is articulated in United States v. Lichenstein, 610 F.2d 1272 (5th Cir. 1980). "A material false statement under [§ 1001] is one that is capable of affecting or influencing the exercise of a government function." Lichenstein, 610 F.2d at 1278. A false statement need not be shown to have actually influenced the government or caused it any pecuniary loss to be material under § 1001. Id. The false statement need only "have the capacity to

impair or pervert the functioning of a governmental agency." Id.; see also Brogan v. United States, 522 U.S. 398, 402 (1998). The purpose of this "judge-made limitation of materiality" is to ensure that the reach of § 1001 is confined to reasonable bounds and not allowed to embrace trivial falsehoods. Lichenstein, 610 F.2d at 1278.

It is clear that the misrepresentations in the present case would, if pervasive, prevent the Government from using SEDs to properly calculate the trade deficit. InfoCom was engaged in a company-wide practice of understating values on export documents by several thousands of dollars on each shipment, totaling almost $700,000 in under-reported values.

The evidence also demonstrates that SEDs were used by the Government for other purposes besides calculating the trade deficit. The Government offered evidence that SED values are used as an enforcement tool to help determine which transactions warrant additional scrutiny. Thus, the intentional misstatements impaired the Government's ability to identify shipments that might have been in violation of United States export regulations. See United States v. Fedorenko, 597 F.2d 946, 951 (5th Cir. 1979) (holding that misstatements made in naturalization proceedings are material if "disclosure of the true facts would have led the government to make an inquiry that might have uncovered other facts warranting denial of citizenship."). Not all misstatements of value satisfy this standard, but there was sufficient evidence that the misstatements contained in the SEDs were material in the present case.

Hazim, Ghassan, and Bayan claim they had no knowledge of or involvement in preparing and filing SEDs with false declared values. There was sufficient evidence to support their convictions for making false statements. Hazim, Ghassan, and Bayan do not deny that they knew that InfoCom used a double invoicing system for the purpose of misrepresenting the values of goods sold by InfoCom. Each regularly communicated with customers about the

practice, and it was clear from these communications that the reason for the practice was to reduce the values that would be reported on shipping documents. There also was evidence that all employees at InfoCom knew that completing SEDs was a necessary step in the process of shipping goods and that the value on an SED would have to match the value on the invoice. A reasonable jury could infer that Defendants knew the false value information they prepared would be reported on SED forms.

## D. Dealing in the Property of an SDT

Bayan, Basman, and Ghassan challenge the sufficiency of the evidence supporting their convictions for dealing in the property of an SDT, which was the subject of the second trial under the district court's order for separate trials.

Executive Order 12947 prohibits any person in the United States from dealing in any property or property interest of an SDT. 60 Fed. Reg. 5079; see also 31 C.F.R. §§ 595.201(a), 595.204. Under IEEPA, it is a crime to willfully violate Executive Order 12947. 50 U.S.C. § 1705(a), (c). Accordingly, the elements of the crime of dealing in the property of an SDT are: (1) Defendants knowingly dealt in the property or property interest of the SDT; (2) the property was within the United States or within the possession of a United States person; and (3) Defendants knew that they were prohibited from dealing in any property or property interests of the SDT. See 50 U.S.C. § 1705(c); 31 C.F.R. §§ 595.201(a), 595.204; Sipe, 388 F.3d at 480 n.21.

On August 16, 1995, OFAC designated Marzook, a leader of Hamas, as an SDT. See 60 Fed. Reg. 44932. After that date, no person in the United States could, without a license from OFAC, lawfully deal in the money, notes, obligations, or other interest in property of Marzook. See 31 C.F.R. § 595.310 (defining "property").

Defendants do not dispute that the $250,000 investment in InfoCom and the resulting payments were held within the United States or possessed by

18

United States persons, and they do not contest that they dealt in that property. Defendants also do not deny that they knew that Marzook was an SDT beginning in August 1995 or that dealing in his property after that date was unlawful. The only disputes are whether the evidence sufficiently showed that Marzook had an interest in the $250,000 investment and its proceeds and whether each Defendant knew of that interest.

Defendants argue that the Murabaha Agreement assigned Marzook's investment to his wife, Nadia. There is no question that Defendants could not be convicted if they believed that Marzook no longer held any interest in his investment. The Government asserts that it presented sufficient evidence for a reasonable jury to conclude that the Murabaha Agreement was a sham intended to conceal Marzook's investment.

The facts surrounding Marzook's investment and the execution of the Murabaha Agreement suggest that Defendants and Marzook were concerned that their business relationship might become publicly known, putting Marzook's assets in jeopardy. When the New York Times published a front-page article reporting that Marzook was a leader of Hamas, Nadia almost immediately began moving Marzook's assets out of the United States. It was at this time that the Murabaha Agreement was drafted. The Murabaha Agreement says nothing of assigning any interest of Marzook to Nadia, suggesting that the purpose of the Agreement was something other than an assignment.

After the Murabaha Agreement was made, InfoCom attempted to delete Marzook's name from its books, which the jury could infer was an attempt by Marzook and Defendants to cover their tracks. Defendants repeatedly lied to law enforcement about InfoCom's prior financial dealings with Marzook. For example, Bayan, in the presence of Basman and Ghassan, falsely told federal agents enforcing a grand jury subpoena that there were no records of any dealings between InfoCom and Marzook. In response to OFAC inquiries,

19

InfoCom reported no transactions with Marzook. Basman forwarded an InfoCom financial report falsely representing that Nadia invested the $150,000 in March 1993 when in fact the contribution was made by Marzook in July 1992. Ghassan sent the Murabaha Agreement to Nadia and spoke to her about it. Later, during a phone call with Nadia in 1996, Ghassan became concerned that a journalist who called Nadia might discover the financial relationship between InfoCom and Marzook. There is no plausible explanation for Defendants' attempts to conceal Marzook's financial dealings with InfoCom if they believed that the Murabaha Agreement divested Marzook of any interest in the investment. As stated above, guilty knowledge can be inferred from false statements and attempted coverups. Diaz-Carreon, 915 F.2d at 955.

There is evidence that Defendants and Marzook continued to treat the investment as belonging to Marzook even after the Murabaha Agreement was executed. After the Agreement was executed, InfoCom deposited a $50,000 check written by Marzook, not Nadia, in partial payment of the required $250,000 investment. A hand-written list of InfoCom's investors found in Basman's office included the notation "MUSA = 250,". "Musa" is an English spelling of Marzook's first name. The note could not have been written until after the Murabaha Agreement was drafted because almost half of the $250,000 investment was made after the Agreement was executed. There also was some evidence that Marzook continued to exercise authority over and had communications with Defendants about the proceeds from his investment.

Bayan, Basman, and Ghassan contend that, even if the Murabaha Agreement was a sham, there is insufficient evidence to infer that they knew that the investment continued to belong to Marzook. The evidence of Defendants' attempts to conceal Marzook's financial dealings with InfoCom strongly suggests otherwise. See United States v. Villarreal, 324 F.3d 319, 325 (5th Cir. 2003) (holding that a defendant's false statements "may give rise to an

inference of consciousness of guilt"). While not dispositive in itself, it should also be noted that all three Defendants not only had a long business relationships with Marzook, but were also related to him by marriage.

Based on the totality of the evidence, including Defendants' attempts to conceal their dealings with Marzook, their family and business history, the intimate nature of their small, family-run business, and their roles and experience in the business, a reasonable jury could infer that Defendants knew that the Murabaha Agreement was a sham intended to conceal the fact that Marzook retained an interest in his $250,000 investment in InfoCom.[7]

## III. NON-PROSECUTION CLAUSE IN IHSAN PLEA AGREEMENT

### A. Background

Ihsan contends that by bringing the indictment against him that led to the present case, the Government breached a plea agreement with him stemming from his separate business.[8] We agree.

The facts surrounding the plea agreement are as follows. In August of 2000, Ihsan left InfoCom to start his own computer-export business, Tetrabal Corporation. In September 2001, the Commerce Department issued a Temporary Denial Order ("TDO") against InfoCom, Tetrabal, and the Elashi brothers individually. The TDO asserted that InfoCom had violated export laws by exporting goods to Libya and Syria. In spite of the TDO, Ihsan and Tetrabal continued exporting to Saudi Arabia, Jordan, Egypt, and Lebanon. In an indictment filed on February 6, 2002, and superseded on April 10, 2002, Ihsan

---

[7] Defendants do not independently challenge the sufficiency of evidence on Count 26 (conspiracy to deal in the property of an SDT) or Counts 37-46 (money laundering). Because Defendants' basis for challenging these counts depends entirely on the sufficiency of the evidence in support of the other SDT offenses, we hold that there was sufficient evidence in support of these convictions as well.

[8] Ihsan was not charged with the violations regarding the SDT. Thus, our analysis in this section centers only on the export violation counts.

was charged with thirteen counts of shipping goods in violation of the TDO, and other related charges. The indictment concerned exports by Tetrabal.

On June 17, 2002, Ihsan entered into a plea agreement with the Government, where he agreed to plead guilty to a single count of shipping in violation of a TDO. In return, the Government agreed that it would not "seek, prefer or prosecute any further criminal charges against [Ihsan] arising out of the facts and circumstances known by the government at this time surrounding [Ihsan's] involvement in the crimes addressed in the superseding indictment." The cover letter accompanying the plea agreement specifically stated that the plea did not absolve Ihsan of any responsibility for any acts previously committed as a representative of InfoCom.

B.      Standard of Review

"This court reviews a claim of breach of a plea agreement de novo, accepting the district court's factual findings unless clearly erroneous." United States v. Lewis, 476 F.3d 369, 387 (5th Cir.), cert. denied, 127 S. Ct. 2893 (2007).

C.      Discussion

"If a defendant pleads guilty as part of a plea agreement, the Government must strictly adhere to the terms and conditions of its promises in the agreement." United States v. Munoz, 408 F.3d 222, 226 (5th Cir. 2005). We "apply general principles of contract law in order to interpret the terms of the plea agreement." Lewis, 476 F.3d at 387. Thus, a plea agreement is construed strictly against the Government as the drafter. United States v. Somner, 127 F.3d 405, 408 (5th Cir. 1997). "To assess whether a plea agreement has been violated, this court considers 'whether the government's conduct is consistent with the defendant's reasonable understanding of the agreement.'" Lewis, 476 F.3d at 387-88 (quoting United States v. Valencia, 985 F.2d 758, 761 (5th Cir. 1993)).

The Government agreed that it would not "seek, prefer or prosecute any further criminal charges against [Ihsan] arising out of the facts and circumstances known by the government at this time surrounding [Ihsan's] involvement in the crimes addressed in the superseding indictment." Thus, the broad language of the plea agreement is limited only in two ways for purposes of our inquiry: (1) the barred prosecution must "arise out of" facts and circumstances known to the Government at the time of the plea agreement; and (2) that knowledge must be of facts and circumstances "surrounding" Ihsan's involvement in the crimes addressed in the Tetrabal indictment.

The Government clearly knew at the time of the plea offer about "facts and circumstances" of the Libyan and Syrian shipments that form the basis of the current prosecution. There is no question that the present prosecution "arise[s] out of" those shipments. Both the Supreme Court and this court have given the phrase "arising out of" a very broad interpretation in other contexts. See, e.g., Prima Paint Corp. v. Flood & Conklin Mfg. Co., 388 U.S. 395, 398 (1967) (recognizing that arbitration clause using that phrase was "broad"); Am. States Ins. Co. v. Bailey, 133 F.3d 363, 370 (5th Cir. 1998) ("This court has held that the words 'arising out of,' when used within an insurance policy, are broad, general, and comprehensive terms effecting broad coverage." (internal quotations omitted)).

The question, then, is whether the shipments to Libya and Syria that originally formed the predicate for the TDO are facts and circumstances "surrounding" Ihsan's involvement in the crimes addressed in the Tetrabal indictment. The Tetrabal indictment leaves us with no doubt that they are.[9] In

---

[9] We take judicial notice of the indictment in the Tetrabal case. See United States v. Capua, 656 F.2d 1033, 1038 n.3 (5th Cir. 1981). That indictment reads, in part: "Prior to the creation of Tetrabal, the defendant Ihsan Elashyi was employed by Infocom corporation, . . . . While Ihsan Elashyi was employed by Infocom, Infocom was also engaged in the sale and export of computer hardware . . . principally to customers in the Middle East. [The Assistant

23

the Tetrabal indictment, the Government discussed both Infocom and shipments to Libya and Syria. In fact, the Government re-alleged and incorporated by reference its discussion of Infocom and the shipments to Libya and Syria in connection with every count of the Tetrabal indictment. The obvious purpose of including this information in the indictment was to inform Ihsan of the facts and circumstances surrounding the offenses in question. See United States v. Nevers, 7 F.3d 59, 63 (5th Cir. 1993) (noting that indictment must "describe the specific facts and circumstances surrounding the offense in question in such manner as to inform the defendant of the particular offense charged").

The Government asserts that the crimes alleged in the Tetrabal indictment only concerned specific shipments to countries other than Libya and Syria occurring years after the shipments at issue in this case. While shipments to countries other than Libya and Syria were the basis of the specific criminal offenses charged, the plea agreement entered into by Ihsan was not so limited. The Government agreed not to prosecute any crimes arising from facts or circumstances "surrounding [Ihsan's] involvement in the crimes addressed in the superseding indictment." (emphasis added). This language is far broader than plea agreements considered in several other opinions of this court. See, e.g., Lewis, 476 F.3d at 387-88; United States v. Cantu, 185 F.3d 298, 305 (5th Cir. 1999) ("The language of the plea agreement is narrowly worded, speaking only to the government's obligation to dismiss 'Count II of the First Superseding Indictment.'"). We hold that the language of the plea agreement in this case unambiguously extends to all crimes arising out of the conduct alleged in the Tetrabal indictment, including shipments to Libya and Syria that give rise to Ihsan's convictions in the present case.

---

Secretary of Commerce issued a TDO]. The Assistant Secretary . . . found that Infocom, and . . . Tetrabal . . . were related entities. Said [TDO] was based upon evidence that Infocom had shipped and attempted to ship goods to Libya and Syria without authorization from the United States."

The Government requests that this court consider the cover letter accompanying the plea agreement, which termed the attached agreement as a "plea offer" and stated that the plea agreement would not absolve Ihsan of responsibility for any acts committed as a representative of InfoCom. We decline to consider the cover letter because the meaning of the plea agreement is unambiguous. See, e.g., United States v. Ballis, 28 F.3d 1399, 1410 (5th Cir. 1994) (holding that although circumstances surrounding the agreement's negotiations might indicate the parties' intent, "parol evidence is inadmissible to prove the meaning of an unambiguous plea agreement."). Accordingly, we hold that the Government breached its plea agreement with Ihsan by prosecuting the present case. We reverse the district court's denial of Ihsan's motion to dismiss the indictment and vacate his conviction in this case. Of course, his conviction for the Tetrabal incident remains.

## IV.  COCONSPIRATOR STATEMENTS

### A.    Background

As discussed above, in September 2001, the Commerce Department entered a TDO barring InfoCom and Defendants from exporting goods. The TDO was based on evidence that Defendants had shipped goods to Libya and Syria without required licenses or authorizations and had filed false SEDs. In February 2002, Bayan and Basman filed affidavits on behalf of InfoCom to convince Commerce that they had not knowingly violated the export laws and to get the TDO lifted so InfoCom could resume its export business.

At trial, the Government introduced the affidavits to prove Defendants' consciousness of guilt by showing that the explanations in the affidavits were inconsistent with the evidence at trial. Ghassan objected, but the district court admitted the affidavits against all Defendants, finding that they were coconspirator statements made during and in furtherance of the conspiracy. Ghassan contends on appeal that the affidavits were not statements of

coconspirators made during and in furtherance of the conspiracy and that, as a result, their admission violated the Confrontation Clause and the rules against hearsay.

B.   Standard of Review

The district court's finding that the affidavits were admissible as coconspirator statements is reviewed for abuse of discretion.  United States v. Robinson, 367 F.3d 278, 291 (5th Cir. 2004).

C.   Discussion

Under our precedent, the proponent of admittance under Rule 801(d)(2)(E) "must prove by a preponderance of the evidence '(1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy.'" United States v. Delgado, 401 F.3d 290, 297 (5th Cir. 2005) (quoting Robinson, 367 F.3d at 291-92).  Ghassan acknowledges that a coconspirator statement admitted under Rule 801(d)(2)(E) does not violate the Confrontation Clause, so the only issue for the court to decide is whether the affidavits were admissible under Rule 801(d)(2)(E).

The jury found beyond a reasonable doubt that Bayan, Basman, and Ghassan were members of a conspiracy, satisfying the first two requirements of Rule 801(d)(2)(E).  Ghassan argues that the affidavits were not in furtherance of the conspiracy.  We disagree.  Shipping goods overseas was an essential element of the conspiracy and could not continue as long as the TDO was in place.  "Efforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end."  United States v. Phillips, 219 F.3d 404, 419 (5th Cir. 2000).

Ghassan also contends that the conspiracy was not ongoing in 2002 when the affidavits were filed because the indictment alleged the conspiracy ended on

or about August 2001. This is partially true. The indictment alleged the exportation conspiracy ended on or about August 2001, but also alleged that the false-statement conspiracy continued "until in or around the date of this [Second Superseding] Indictment," which was returned on August 21, 2003. The affidavits could have been used to further the false-statement conspiracy, which also depended on InfoCom's ability to export goods.

Even if the indictment alleged only the exportation conspiracy, the Government would not be limited to offering coconspirator statements in furtherance of that conspiracy as it was defined in the indictment. "'The conspiracy that forms the basis for admitting the coconspirators' statements need not be the same conspiracy for which the defendant is indicted.'" Delgado, 401 F.3d at 299 (quoting United States v. Arce, 997 F.2d 1123, 1128 (5th Cir.1993)). Thus, the language in the indictment is not determinative.

Accordingly, we hold that the district court did not err in admitting Bayan's and Basman's affidavits as coconspirator statements.

## V.  JURY INSTRUCTIONS

A.    Standard of Review

"A properly objected-to instruction is reviewed for abuse of discretion." United States v. Freeman, 434 F.3d 369, 377 (5th Cir. 2005). "We consider whether the instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs jurors as to the principles of law applicable to the factual issues confronting them.'" Id. (quoting United States v. Daniels, 281 F.3d 168, 183 (5th Cir. 2002)). "In determining whether the evidence supports the charge, the evidence and all reasonable inferences that may be drawn from it are viewed in the light most favorable to the government." Id. at 378.

B.    Jury Instruction on Deliberate Ignorance

Basman, Bayan, Hazim, and Ghassan argue that the district court erred in giving the jury a deliberate ignorance instruction.  They claim that there was no evidence to support such an instruction.

This court has approved of the deliberate ignorance instruction if there is a sufficient factual basis.  Id.  "The proper factual basis is present if the record supports inferences that '(1) the defendant was subjectively aware of a high probability of the existence of illegal conduct; and (2) the defendant purposely contrived to avoid learning of the illegal conduct.'" Id. (quoting United States v. Scott, 159 F.3d 916, 922 (5th Cir. 1998)).

Viewing the evidence in the light most favorable to the Government, the district court did not abuse its discretion in giving the deliberate ignorance instruction.  As discussed above, the Government offered evidence of the suspicious circumstances surrounding the shipments to Libya and Syria.  The goods were shipped to a freight forwarder, CIT sent faxes from Libya, Defendants entered the Libyan contact information in their database, goods were shipped to Rome to a customer known to live in Libya, and Defendants instructed their clients that communications and goods had to go "through" unsanctioned countries.  The Government also offered evidence of the suspicious circumstances surrounding Marzook's investment in InfoCom and the Murabaha Agreement following the public revelation of Marzook's terrorist ties.  This evidence supported inferences that Defendants were subjectively aware of a high probability of the existence of illegal conduct and that they purposely contrived to avoid learning of the illegal conduct.

C.    Jury Instruction on the Meaning of "Willfully" Under the IEEPA

Bayan, Ghassan, and Basman argue that the district court failed to properly instruct the jury on the elements of the IEEPA counts.   Defendants assert that to be convicted for dealing in the property of an SDT, the

28

Government must prove that Defendants not only intended to violate the law by dealing in the property of the SDT, but also that they intended that the property be used to further the unlawful activities of the SDT.

The IEEPA makes it a crime to willfully "violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation, or prohibition issued under this chapter." 50 U.S.C. § 1705(a), § 1705(c). Executive Order 12947, which was executed pursuant to the IEEPA, prohibits any person in the United States from dealing in any property or property interests of an SDT. 60 Fed. Reg. 5079.

Defendants argue that the statutory requirement that the act be done "willfully" means that the Government must prove that Defendants not only intended to violate the law by dealing in the property of the SDT, but also that they intended that the property be used to further the unlawful activities of the SDT. In support of their argument, Defendants cite an opinion from the Middle District of Florida. See United States v. Al-Arian, 308 F. Supp. 2d. 1322, 1340 (M.D. Fla. 2004). Al-Arian did hold that an element of the crime of dealing in the property of an SDT was that the defendant "had a specific intent that the contribution be used to further the unlawful activities of the SDT." Id.

Nothing in Executive Order 12947 limits its prohibition to dealing in property used to further the unlawful activities of the SDT. It prohibits dealing in all property of an SDT. 60 Fed. Reg. 5079. As other courts have noted, adding a requirement that the defendant have the specific intent to further the terrorists' unlawful activities would effectively rewrite the statute. See, e.g., United States v. Assi, 414 F. Supp. 2d 707, 724 (E.D. Mich. 2006); Linde v. Arab Bank, PLC, 384 F. Supp. 2d 571, 587 n.11 (E.D.N.Y. 2005); United States v. Marzook, 383 F. Supp. 2d 1056, 1070 (N.D. Ill. 2005). We decline to follow Al-Arian here.

In Bryan v. United States, 524 U.S. 184 (1998), the Supreme Court held that the term "willful" in the criminal context generally requires that "the Government must prove that the defendant acted with knowledge that his conduct was unlawful." Id. at 192 (quotation marks omitted); see also Sipe, 388 F.3d at 480 n.21 (approving of jury instruction that an act is done willfully if "it is done voluntarily and intentionally and with the specific intent to do something the law forbids"). The district court properly instructed the jury that "willfully" means "with the specific intent to do something the law forbids; that is to say, with the bad purpose either to disobey or disregard the law." Accordingly, we hold that the district court did not err in instructing the jury.

## VI. OTHER ALLEGED TRIAL ERRORS

A. Failure to Dismiss a Juror for Cause

Bayan asserts that the district court erred in failing to excuse for cause a juror that expressed strong feelings about the Israeli-Palestinian conflict and Palestinian suicide bombers and activists.[10] The district court questioned the juror, and it determined that he was able to put aside his views and properly serve. Defendants then used a peremptory strike to exclude him from the jury.

Bayan's arguments are foreclosed by the Supreme Court's decision in United States v. Martinez-Salazar, 528 U.S. 304, 307 (2000) ("[I]f the defendant elects to cure such an error [of the erroneous denial of a challenge for cause] by exercising a peremptory challenge, and is subsequently convicted by a jury on which no biased juror sat, he has not been deprived of any rule-based or constitutional right."), and this court's opinion in United States v. Sanchez-Hernandez, 507 F.3d 826, 829-30 (5th Cir. 2007), cert. denied, 128 S. Ct. 1912 (2008), (holding that there is no reversible error even if the defendant shows that

---

[10] Basman and Ghassan also raised this argument on appeal but conceded the issue in their reply briefs.

he would otherwise have used all his peremptory challenges for noncurative purposes).

B.     Testimony that Defendants Spoke With Their Attorney

Ghassan argues that the district court improperly admitted testimony that Defendants spoke with their attorney during the FBI's service of a subpoena on InfoCom in July 1995.  Ghassan argues that the introduction of this evidence about his pre-arrest silence violated his Fifth Amendment right against self-incrimination.  Ghassan acknowledges that his claim is foreclosed by prior opinions of this court that hold that a prosecutor's reference to a non-testifying defendant's pre-arrest silence does not violate the privilege against self-incrimination if the defendant's silence is not induced by, or a response to, the actions of a government agent.  See, e.g., United States v. Salinas, 480 F.3d 750, 758 (5th Cir.), cert. denied, 128 S. Ct. 487 (2007).

C.     Closing Argument

1.     Background

Ghassan argues that, during closing arguments, the Government improperly commented on his decision not to testify in the second trial.  During the second trial, Ghassan's attorney asked FBI Agent Miranda to describe various parts of the Murabaha Agreement, including the paragraph that reads, "[W]hereas the second party intends to invest his Fund with the first party for earning profits based on Islamic laws."  Counsel for Ghassan asked Miranda, "So that really should say 'her,' shouldn't it?" referring to the fact that the second party was Nadia.  Miranda responded, "I guess you would have to ask your client, sir."  No party objected.  The Government's attorney referenced the statement during his closing arguments, which drew the objection of Ghassan's counsel.  The objection was overruled.

2.     Standard of Review

The Government argues that, because Ghassan did not object when the testimony was offered, this issue is reviewed for plain error.  The Government is correct if the issue is the admissibility of the testimony.  See United States v. Olano, 507 U.S. 725, 731 (1993).  Ghassan clearly cannot satisfy the plain error standard, and to the extent that he challenges the admissibility of the testimony in the first instance, we hold that the district court did not plainly err.

Ghassan did object to the prosecutor's comment during closing argument, however, and that objection was overruled by the district court.  Whether a prosecutor's argument is an impermissible comment on the defendant's right not to testify is reviewed de novo.  United States v. Martinez, 151 F.3d 384, 392 (5th Cir. 1998).

3.     Discussion

"'The test for determining whether a prosecutor's remarks constitute a comment on a defendant's silence is a twofold alternative one: (1) whether the prosecutor's manifest intent was to comment on the defendant's silence or (2) whether the character of the remark was such that the jury would naturally and necessarily construe it as a comment on the defendant's silence.'"  Id. (quoting United States v. Mackay, 33 F.3d 489, 495 (5th Cir.1994)); see also Cotton v. Cockrell, 343 F.3d 746, 751 (5th Cir. 2003).  "The prosecutor's intent is not manifest if there is some other, equally plausible explanation for the remark."  Cotton, 343 F.3d at 751 (quoting United States v. Grosz, 76 F.3d 1318, 1326 (5th Cir.1996)).  In deciding whether a jury would naturally and necessarily construe a remark as a comment on the defendant's failure to testify, "'the question is not whether the jury possibly or even probably would view the challenged remark in this manner, but whether the jury necessarily would have done so.'"  Id. (quoting Grosz, 76 F.3d at 1326).

The challenged testimony was made in response to a question from Ghassan's counsel, a question that obviously could not be answered by the witness. The testimony itself, and the prosecutor's reference to that testimony, did not mention the failure to testify, and we hold that a jury would not necessarily have viewed either as a comment on Ghassan's choice not to take the stand in his defense. See United States v. Guerra, 293 F.3d 1279, 1288-89 (11th Cir. 2002) (holding that where a government witness testified on cross-examination, "You would have to ask your client," there was "no ground for concluding that the jury would naturally and necessarily construe the comment to refer to [the defendant's] supposed silence, as the context of the statement reveals that the witness was referring to his inability to answer the question"). Moreover, the obvious purpose in raising the statement during closing arguments was to direct the jury's attention to evidence that the Murabaha Agreement was part of Defendants' attempt to conceal Marzook's investment. The district court did not err in denying Ghassan's objection.

D.   Failure to Redact Wiretap Recording

1.   Background

Defendants claim that the district court erred by denying a mistrial after the Government erroneously played a taped conversation of Ghassan in which he stated "and America practiced terrorism." The Government had been ordered to redact the conversation to exclude those words but failed to do so. The mistake was not caught until the tape was played for the jury. Defendants moved for a mistral, which the court denied. The parties then agreed the issue should not be raised with the jury to avoid drawing further attention to it.

The Government admits the tape should have been redacted, but it argues that there was not a significant possibility that the prejudicial evidence had a substantial impact on the jury verdict because the tape was played only once in

passing and the phrase that should have been redacted was not referenced again during the trial.

## 2.    Standard of Review

We review the denial of a mistrial for abuse of discretion. United States v. Le, 512 F.3d 128, 133 (5th Cir. 2007), cert. denied, 129 S. Ct. 55 (2008). Where the jury hears prejudicial information, "'a new trial is required only if there is a significant possibility that the prejudicial evidence had a substantial impact upon the jury verdict, viewed in light of the entire record.'" Id. (quoting United States v. Paul, 142 F.3d 836, 844 (5th Cir. 1998)). "We give great weight to the trial court's assessment of the prejudicial effect of the evidence, and prejudice may be rendered harmless by a curative instruction." United States v. Lucas, 516 F.3d 316, 345 (5th Cir.), cert. denied, 129 S. Ct. 116 (2008).

## 3.    Discussion

There is no doubt that the statement played for the jury had potential for prejudicial effect. But the statement was a very short part of one of many recordings played for the jury during a two-week trial, and it was played only one time. Counsel for Defendants noted that it "went by so fast" when discussing how to respond to the Government's error. There was no further comment on the prejudicial portion of the tape during the remainder of the lengthy trial. We hold that the district court did not abuse its discretion in refusing to grant a mistrial.

## VII.  SENTENCING ISSUES

### A.    Standard of Review

Defendants assert various errors relating to their sentencing. A district court's legal conclusions, including its interpretation of the Sentencing Guidelines, is reviewed de novo. See United States v. Galvan-Revuelta, 958 F.2d 66, 68 (5th Cir. 1992). This court reviews a district court's factual determinations in applying the guidelines for clear error. United States v. Solis-

Garcia, 420 F.3d 511, 514 (5th Cir. 2005). "There is no clear error if the district court's finding is plausible in light of the record as a whole." *United States v. Cisneros-Gutierrez*, 517 F.3d 751, 764 (5th Cir. 2008) (quotation marks omitted).

B.    Evasion of National Security Controls

Ghassan contends that the district court erred in holding that their export violations evaded "national security controls" under U.S.S.G. § 2M5.1(a) (2005), which made his starting base-offense level 26, rather than 14. Ghassan concedes in his reply brief that there are no authorities to support his reading of § 2M5.1(a), but asserts that this court should invoke the rule of lenity in its interpretation of the Guidelines. See *Ladner v. United States*, 358 U.S. 169, 177 (1958). "'[T]he touchstone of the rule of lenity is statutory ambiguity.'" *Burgess v. United States*, 128 S. Ct. 1572, 1580 (2008) (quoting *Bifulco v. United States*, 447 U.S. 381, 387 (1980) (alteration in original); see also *United States v. Rivera*, 265 F.3d 310, 312 (5th Cir. 2001).

Section 2M5.1 states that the base offense level for evasion of export controls is "26, if (A) national security controls or controls relating to the proliferation of nuclear, biological, or chemical weapons or materials were evaded; or (B) the offense involved a financial transaction with a country supporting international terrorism." U.S.S.G. § 2M5.1(a) (emphasis added). Otherwise, the base level offense is 14. Id. This court has not had the opportunity consider whether export regulations targeted against state sponsors of terrorism are "national security controls" under 2M5.1(a).

In Executive Order No. 12,543, the President determined that Libya posed an "unusual and extraordinary threat to the national security and foreign policy of the United States" and therefore ordered an embargo covering the exportation of virtually all goods to Libya. 51 Fed. Reg. 875 (Jan. 7, 1986). As a State Sponsor of Terrorism, Syria was also subject to export restrictions under EAR. See, e.g., 15 C.F.R. § 742.9 (2000). The President, exercising the power vested

in him by Congress, determined that it was a threat to national security to allow the unlicensed and unauthorized sale of certain goods, including computers, to anyone in those countries. Every court to consider the issue has held that the evasion of sanctions against state sponsors of terrorism are "national security controls." See, e.g., United States v. McKeeve, 131 F.3d 1, 14 (1st Cir. 1997) (holding that export of computer equipment to Libya was evasion of national security controls); United States v. Shetterly, 971 F.2d 67, 76 (7th Cir. 1992) (holding that export of microwave amplifier to West Germany was evasion of national security controls).

Ghassan suggests that the issue should be decided based on the nature of the goods shipped, not on the nature of the embargoes. The First Circuit, when considering the exact same argument, held:

> [S]ection 2M5.1(a)(1) applies to any offense that involves a shipment (or proposed shipment) that offends the embargo, whether or not the goods shipped actually are intended for some innocent use. The appellant's argument to the contrary seeks to substitute the judgment of a factfinder for that of the executive branch, which has made a determination that the export of any goods to Libya, excepting only certain humanitarian aid, threatens national security interests.

McKeeve, 131 F.3d at 14 (internal citations omitted). We agree with the First Circuit's analysis and hold that export regulations targeted against state sponsors of terrorism are "national security controls" under 2M5.1(a). Having found no ambiguity in § 2M5.1(a), the rule of lenity has no application to this case. Accordingly, the district court did not err in holding that their export violations evaded "national security controls" under U.S.S.G. § 2M5.1(a).

C.    Determining Loss Under the Guidelines

Basman and Ghassan contend that the district court erred in imposing a six-level enhancement for loss in calculating the advisory Guidelines range for the false-statement offenses.

The Guidelines provide for increases in the offense level based on the loss suffered. U.S.S.G. § 2B1.1(b)(1). The sentencing court is entitled to find facts relevant to the sentencing range by a preponderance of the evidence. Lewis, 476 F.3d at 389. A district court's loss calculation "is a factual finding that this court reviews for clear error." United States v. Caldwell, 302 F.3d 399, 418 (5th Cir. 2002).

Each Defendant's PSR recommended the district court find a loss amount of $696,851, which is the amount by which Defendants undervalued goods in eighty-nine shipments between August 1995 and October 2000. Defendants argued that this did not reflect any actual loss. The Government agreed the calculation was flawed, but argued that there was a loss to foreign governments, namely the taxes or tariffs lost as a result of Defendants' scheme of declaring reduced values on exports.

Counsel for Hazim then proffered that a witness would testify that the median tariff rate for Defendants' shipments was ten percent. Limiting the losses to the overt acts stated in the indictment, Hazim stated that the amount of the understatement of value was $307,702, which would yield a loss of $30,770. Hazim and the Government then "reached an agreement that the loss will be more than $30,000 but less than $70,000," resulting in a six-level enhancement under Section 2B1.1(b)(1)(D). Hazim reserved his objection that there was no loss. Basman and Ghassan also argued that there was no loss. After the district court found that there was a loss, Basman and Ghassan agreed to the same stipulation regarding the amount of loss. Thus, under the agreement reached by Defendants, they reserved their objection that there was no loss suffered, but stipulated that if there was a loss, the amount would fall in the $30,000 to $70,000 range provided for under Section 2B1.1(b)(1)(D).

The district court's finding that there was a loss was not clearly erroneous. Defendants admitted that the purpose of the understated values on the SEDs

was to allow their customers to pay lower tariffs. Thus, there was evidence that Defendants' false statements on the SEDs caused foreign governments to lose tariff revenue. While there was no evidence supporting a calculation of the amount of loss suffered, that issue was stipulated by Defendants. Accordingly, the district court did not err in imposing a six-level enhancement for loss.

D.    Presumption of Reasonableness to the Sentencing Guidelines

Ghassan and Basman contend that the district court erred in applying a presumption of reasonableness to the Sentencing Guidelines. The Government asserts that Defendants failed to preserve the objection and that any error was not plain.

Defendants did not raise this objection during sentencing, thus, this court's review is for plain error. See United States v. Rodriguez-Rodriguez, 530 F.3d 381, 387-88 (5th Cir. 2008); United States v. Campos-Maldonado, 531 F.3d 337, 339 (5th Cir.), cert. denied 129 S. Ct. 328 (2008). This court will not reverse for plain error unless (1) there is error, (2) it is plain, and (3) it affects substantial rights. United States v. Gonzalez-Ramirez, 477 F.3d 310, 311 (5th Cir. 2007). "If these conditions are met, an appellate court may exercise its discretion to notice the forfeited error only if the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." Id. at 311-12 (quotations omitted) (alteration in original).

"[T]he sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." Rita v. United States, --- U.S. ----, 127 S. Ct. 2456, 2465 (2007). Instead, the district court "must make an individualized assessment based on the facts presented." Gall v. United States, --- U.S. ----, 128 S. Ct. 586, 597 (2007).

The district court did err in applying a presumption of reasonableness to the Guidelines sentence, but we hold that the resulting error was not plain error. The district court was aware of Defendants' arguments for a sentence below the

Guidelines, but concluded that a sentence yielded by the Guidelines would adequately address all of the sentencing factors set out in § 3553(a)(2). We do not exercise our discretion to notice the forfeited error because the district court's application of a presumption of reasonableness did not affect the fairness, integrity, or public reputation of the judicial proceedings.

## VIII. CONCLUSION

For the foregoing reasons, the judgment of conviction as to Ihsan is REVERSED and VACATED. In all other respects, the judgment of the district court is AFFIRMED.